John Doe 1,
Plaintiff-Appellant-Petitioner,

v.

Archdiocese of Milwaukee,
Defendant-Respondent,

Alias Insurance Company #1, Defendant.

John Doe 2 and John Doe 3,
Plaintiffs-Appellants-Petitioners,

v.

Archdiocese of Milwaukee,
Defendant-Respondent.

Charles Linneman, Plaintiff-Appellant-Petitioner,

v.

Archdiocese of Milwaukee,
Defendant-Respondent,

Franklyn Becker, Defendant.

Supreme Court

*No. 2005AP1945. Oral argument April 24, 2007.
—Decided July 11, 2007.*

2007 WI 95

(Also reported in 734 N.W.2d 827.)

34

40

For the plaintiffs-appellants-petitioners there were briefs by *Jeffrey R. Anderson,* St. Paul, Minn, *Marci A. Hamilton,* Washington, Pa., and *James S. Smith,* Brookfield, and oral argument by *Marci A. Hamilton.*

For the defendant-respondent there was a brief by *John A. Rothstein, David P. Muth,* and *Quarles & Brady LLP,* Milwaukee, and oral argument by *John A. Rothstein.*

An amicus curiae brief was filed by *Richard Jasperson* and *Richard Jasperson P.A.,* St. Paul, Minn., and *Matthew A. Biegert* and *Doar Drill, S.C.,* New Richmond, on behalf of the Leadership Council on Child Abuse & Interpersonal Violence.

¶ 1. PATIENCE DRAKE ROGGENSACK, J. This is a review of an unpublished decision of the court of appeals that affirmed the circuit court's order dismissing the complaints of John Doe 1, John Doe 2, John Doe 3, and Charles Linneman against the Archdiocese of Milwaukee (the Archdiocese).[1] The court of appeals agreed with the circuit court that the claims against the Archdiocese for negligent supervision and fraud relating to the Roman Catholic priests' sexual molestation of children were barred by the statute of limitations. *John Doe 1 v. Archdiocese of Milwaukee,* No. 2005AP1945, unpublished slip op., ¶ 1 (Wis. Ct. App. Aug. 29, 2006) (*John Doe 1*).

¶ 2. We conclude that the claims asserted against the Archdiocese for negligent supervision are barred by the statute of limitations because according to controlling precedent such claims are derivative and accrued as a matter of law by the time of the last incident of sexual assault. However, we also conclude that the claims of fraud for intentional misrepresentation are independent claims based on the Archdiocese's alleged knowledge of the priests' prior sexual molestation of children and the Archdiocese's intent to deceive children and their families. We further conclude that the date of the accrual of the fraud claims is "when the plaintiffs discovered or, in the exercise of reasonable diligence, should have discovered" that the Archdiocese's alleged fraud was a cause of

---

[1] Judge Michael D. Guolee, Milwaukee County Circuit Court, presided.

their injuries. *John BBB Doe v. Archdiocese of Milwaukee*, 211 Wis. 2d 312, 340, 565 N.W.2d 94 (1997) (*BBB Doe*). This determination cannot be resolved by a motion to dismiss the complaints. Therefore, we affirm the dismissal of the negligent supervision claims; we reverse the dismissal of the fraud claims; and we remand for further proceedings.

## I. BACKGROUND[2]

¶ 3. This review arises from the consolidation of three lawsuits filed against the Archdiocese that was dismissed for failure to state a claim. In 2005, John Doe 1 and John Does 2 and 3 (the Doe plaintiffs), filed complaints that were nearly identical.[3] The Doe plaintiffs, who are adults, allege that from 1973 to 1976, when they were children, a now-deceased Roman Catholic priest, Siegfried Widera, abused them sexually after he had been criminally convicted of sexually molesting another child and the Archdiocese knew of his conviction. It was after Widera's criminal conviction that the Archdiocese moved Widera from a parish in Port Washington, Wisconsin, to St. Andrew's Parish in Delavan, Wisconsin, where Widera molested the Doe plaintiffs.

¶ 4. The Archdiocese also was informed that Widera sexually molested an altar boy at St. Andrew's

---

[2] The facts set forth in the complaints and all reasonable inferences therefrom are taken as true for purposes of our review of the motion to dismiss. *John BBB Doe v. Archdiocese of Milwaukee*, 211 Wis. 2d 312, 320, 565 N.W.2d 94 (1997) (citing *Watts v. Watts*, 137 Wis. 2d 506, 512, 405 N.W.2d 305 (1987)) (*BBB Doe*).

[3] John Doe 2 and John Doe 3 jointly filed one complaint against the Archdiocese.

Parish and confronted Widera, who admitted he had made "a slip." The Archdiocese's notes made contemporaneously with this assault are attached to the complaint. They reveal that it would "try to keep the lid on the thing, so no police record would be made" and also that it knew the mother of the boy "feared reprisals from Church if she would go to police." Subsequently, in 1976, the Archdiocese transferred Widera to California. The Archdiocese told Widera to tell people in Delavan that he was going on vacation rather than telling the truth. Widera molested numerous boys after his transfer to California.

¶ 5. The Doe plaintiffs claim negligent supervision because the "Defendant Archdiocese knew or should reasonabl[y] have known of Widera's dangerous and exploitative propensities as a child sexual exploiter and/or as an unfit agent and despite such knowledge, Defendant Archdiocese negligently retained and failed to provide reasonable supervision of Widera." The Doe plaintiffs also claim fraud because the Archdiocese "knew that Siegfried Widera had a history of sexually molesting children and that he was a danger to children," but notwithstanding that knowledge, the Archdiocese: (1) affirmatively represented that it "did not know that Siegfried Widera had a history of molesting children" and "did not know that Siegfried Widera was a danger to children"; and (2) failed to disclose its knowledge of Widera's history of sexually molesting children.

¶ 6. The Doe plaintiffs contend they did not discover, nor in the exercise of reasonable diligence should they have discovered, that the Archdiocese negligently supervised Widera or that the Archdiocese knew of Widera's history of sexually abusing children until 2004. It was in 2004 that the Doe plaintiffs allege they

discovered that Widera had been convicted of sexually molesting a minor boy prior to Widera's abuse of them. The Doe plaintiffs also contend that they did not discover, nor in the exercise of reasonable diligence should they have discovered, that the Archdiocese's fraud was a cause of their injuries until they learned of Widera's conviction.

¶ 7. In addition, in 2005, Charles Linneman, an adult, filed a complaint alleging that in approximately 1982 another Roman Catholic priest, Franklyn W. Becker, abused him sexually while he was a child.[4] Becker and Linneman became acquainted while Linneman was an altar boy at St. Joseph Church in Lyons, Wisconsin. Becker was subsequently moved to a parish in Milwaukee, Wisconsin, but continued to maintain contact with Linneman. Linneman was sexually abused in the priest's living quarters when he stayed overnight at one of the Archdiocese's churches in Milwaukee in order to serve as an altar boy the next day.

¶ 8. Similar to the Doe plaintiffs' complaints, Linneman claims that the "Archdiocese knew that Franklyn Becker had a history of sexually molesting children and that he was a danger to children" before he molested Linneman in 1982. Linneman sued the Archdiocese for negligent supervision and fraud.[5] Linneman also claims he did not know the Archdiocese defrauded him until recently and did not discover, nor in the exercise of reasonable diligence should he have discovered, that the Archdiocese was a cause of his injuries until recently.

___

[4] The complaint states that Charles Linneman was approximately 12 years old at the time of the abuse.

[5] Charles Linneman also sued Franklyn W. Becker for "fiduciary fraud"; however, the appellants do not assert this claim on appeal.

¶ 9. The Archdiocese moved to dismiss the Doe plaintiffs' complaints asserting, among other things, that the claims were barred by the applicable statute of limitations. The circuit court agreed that the statute of limitations barred the Doe plaintiffs' claims because the last sexual assault occurred 29 years before they brought suit. Linneman subsequently stipulated to the circuit court that his claims were "substantially identical" to the Doe plaintiffs' claims and had similar statute of limitations problems because his last sexual contact with Becker occurred 23 years before his lawsuit was filed. He agreed to the consolidation and dismissal of his claims, but he preserved his right to appeal.

¶ 10. All the plaintiffs appealed and the court of appeals affirmed the dismissal of the complaints against the Archdiocese, concluding that the claims were barred by the statute of limitations. *John Doe 1*, No. 2005AP1945, unpublished slip op., ¶ 1. The court of appeals concluded that the negligent supervision claims were controlled by *BBB Doe*, which concluded that victims of non-incestuous sexual assault knew or should have known they were injured when they were assaulted, and therefore, the victims had "a duty to inquire into the injury that result[ed] from [the] tortious activity." *John Doe 1*, No. 2005AP1945, unpublished slip op., ¶¶ 10–11 (quoting *BBB Doe*, 211 Wis. 2d at 340). As such, "the discovery rule did not save the victims' claims against the priests because the statute of limitations began to run no later than the date of the last sexual assault." *Id.*, ¶ 11 (citing *BBB Doe*, 211 Wis. 2d at 344–45; *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 316–17, 533 N.W.2d 780 (1995)).

¶ 11. The court of appeals also concluded that the fraud claims were barred by Wis. Stat. § 893.93(1)(b) (2005–06)[6] because the statute of limitations began to run when the facts constituting fraud could have been discovered upon diligent inquiry and under *BBB Doe,* "the appellants are deemed, as a matter of law, to have discovered their injuries no later than the last sexual assault. . . . Accordingly, they had a duty to seek out the cause of their injuries . . . at that time." *John Doe 1,* No. 2005AP1945, unpublished slip op., ¶¶ 13–15. All the plaintiffs petitioned for supreme court review, which we granted.

## II. DISCUSSION

A. Standard of Review

¶ 12. We independently review a dismissal for failure to state a claim as a question of law. *Kaloti Enters., Inc. v. Kellogg Sales Co.,* 2005 WI 111, ¶ 10, 283 Wis. 2d 555, 699 N.W.2d 205; *John Doe 67C v. Archdiocese of Milwaukee,* 2005 WI 123, ¶ 19, 284 Wis. 2d 307, 700 N.W.2d 180 *(John Doe 67C).* "A motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint." *BBB Doe,* 211 Wis. 2d at 331. The reviewing court liberally construes the pleadings and accepts the facts as set forth in the complaint, as well as all reasonable inferences from those facts. *Kaloti,* 283 Wis. 2d 555, ¶ 11; *Pritzlaff,* 194 Wis. 2d at 311. However, the court is "not required to assume as true legal conclusions pled by the plaintiffs." *BBB Doe,* 211 Wis. 2d at 331. "Dismissal of a claim is improper if there are any conditions under which the plaintiffs could recover." *Id.*

---

[6] All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

¶ 13. In order to decide whether we should grant the Archdiocese's motion to dismiss, we must determine whether the plaintiffs' claims for negligent supervision and fraud are barred by the applicable statute of limitations. As such, we must determine "when the plaintiffs discovered or, in the exercise of reasonable diligence, should have discovered that they were injured, and the cause of their injury." *Id.* at 340. Reasonable diligence is ordinarily a question of fact for the fact-finder. *Id.* at 341. "However, when the facts and reasonable inferences that can be drawn from them are undisputed, whether a plaintiff has exercised reasonable diligence in discovering his or her cause of action is a question of law. In addition, whether an inference is reasonable is a question of law." *Id.* (citations omitted).[7]

¶ 14. In our analysis of this case, we may consider whether the complaints state claims for fraud due to the failure to disclose, which turns on whether the Archdiocese had a duty to disclose the history of the priests' sexual abuse. "Whether a duty exists is also a question of law that we review independently . . . ." *Kaloti*, 283 Wis. 2d 555, ¶ 10.

B. Motion to Dismiss

■

¶ 15. "A threshold question when reviewing a complaint is whether the complaint has been timely filed, because an otherwise sufficient claim will be

---

[7] Therefore, whether a reasonable person knew or should have known of the Archdiocese's alleged fraud more than six years before the complaints were filed may be a question of law depending on the reasonable inferences from undisputed facts. *See BBB Doe*, 211 Wis. 2d at 341.

dismissed if that claim is time barred." *Pritzlaff,* 194 Wis. 2d at 312. In general, the controlling statutory limitation period is the one in effect when the claim for relief accrued. *Betthauser v. Med. Protective Co.,* 172 Wis. 2d 141, 493 N.W.2d 40 (1992). Substantive "legislation is presumptively prospective unless the statutory language clearly [indicates] an intent that the statute applies retroactively." *Id.* at 147 (quoting *United States Fire Ins. Co. v. E.D. Wesley Co.,* 105 Wis. 2d 305, 319, 313 N.W.2d 833 (1982)). However, if "a statute is procedural or remedial, rather than substantive, the statute is generally given retroactive application." *Id.* Statutes of limitations are generally viewed as substantive because they can extinguish otherwise valid claims, and therefore, the statute of limitations that applies is the one in effect when the claim for relief accrued.[8] *Id.* at 149.

1. Negligent supervision

¶ 16. A claim for negligent supervision of an employee requires a plaintiff to plead and prove all of the following: (1) the employer had a duty of care owed to the plaintiff; (2) the employer breached its duty; (3) a wrongful act or omission of an employee was a cause-in-fact of the plaintiff's injury; and (4) an act or omis-

---

[8] *Black's Law Dictionary* defines "accrue" as follows: "To come into existence as an enforceable claim or right." *Black's Law Dictionary* 22 (8th ed. 2004). We have explained that before a claim for relief can accrue, there must exist "a claim capable of present enforcement, a suable party against whom it may be enforced, and a party who has a present right to enforce it." *Meracle v. Children's Serv. Soc'y of Wis.,* 149 Wis. 2d 19, 26, 437 N.W.2d 532 (1989) (quoting *Barry v. Minahan,* 127 Wis. 570, 573, 107 N.W. 488 (1906)).

sion of the employer was a cause-in-fact of the wrongful act of the employee. *John Doe 67C,* 284 Wis. 2d 307, ¶ 43 (citations omitted).

¶ 17. In the case before us, the last sexual assault of the Doe plaintiffs occurred no later than 1976. Therefore, if their claim for negligent supervision accrued then, the statute of limitations would be three years from that date in 1976. Wis. Stat. § 893.205(1) (1975–76). However, because all of the Doe plaintiffs were less than 18 years of age at the time their claims for relief accrued, the statute of limitations would have been tolled for one year after each Doe claimant reached the age of 18. Wis. Stat. § 893.33(1) (1975–76).

¶ 18. In 1979, ch. 893 was repealed and recreated in its entirety and Wis. Stat. § 893.33 was revamped and renumbered as Wis. Stat. § 893.16. § 28, ch. 323, Laws of 1979. Therefore, if the claim for negligent supervision accrued in 1982, when Linneman alleges he was last assaulted by Becker, the statute of limitations would still be three years, Wis. Stat. § 893.54(1) (1981–82), but it would be tolled for two years after Linneman reached the age of 18. Wis. Stat. § 893.16.[9] The current statute of limitations for negligence is still three years from the date when the claim accrued. § 893.54(1). Therefore, unless the claims for negligent supervision accrued within three years of when the complaints were filed in 2005, they are barred. Accordingly, we must determine when the claims accrued.

¶ 19. Similar to this case, in *BBB Doe,* all the plaintiffs' claims against the Archdiocese included a claim for negligence in the training, placement and supervision of priests who allegedly sexually assaulted

---

[9] The current Wis. Stat. § 893.16 applies to claims for relief that accrued after July 1, 1980. *See* Wis. Stat. § 893.16(5)(c).

them while they were minors. *BBB Doe,* 211 Wis. 2d at 324. In determining when the claims accrued, we first reviewed the policy considerations underlying the statute of limitations and noted:

> On the one hand, we are concerned with allowing tort victims a fair opportunity to enforce legitimate claims against wrongdoers. On the other hand, we are concerned with protecting defendants from having to defend against stale claims, where so much time has passed between the allegedly tortious act and the filing of the claim that witnesses and relevant evidence may be unavailable.

*Id.* at 334.

¶ 20. With these policy considerations in mind, we reviewed the development of the discovery rule in Wisconsin. *Id.* at 334–38. We noted that the discovery rule was first adopted in *Hansen v. A.H. Robins Co.,* 113 Wis. 2d 550, 560, 335 N.W.2d 578 (1983). There we held that "all tort actions other than those already governed by a legislatively created discovery rule . . . accrue on the date the injury is discovered or with reasonable diligence should [have been] discovered, whichever occurs first." *Id.* After *Hansen,* we decided that the discovery rule also applied to discovery of the cause of the injury. *BBB Doe,* 211 Wis. 2d at 335 (citing *Borello v. U.S. Oil Co.,* 130 Wis. 2d 397, 411, 388 N.W.2d 140 (1986)).

¶ 21. In *BBB Doe,* we reviewed opinions in which the discovery rule was applied to negligence allegations arising from sexual assault. *Id.* at 335–38 (citing *Hammer v. Hammer,* 142 Wis. 2d 257, 267, 418 N.W.2d 23 (Ct. App. 1987);[10] *Pritzlaff,* 194 Wis. 2d at 319). In *Pritzlaff,*

---

[10] In *Hammer v. Hammer,* 142 Wis. 2d 257, 267, 418 N.W.2d 23 (Ct. App. 1987), the court of appeals applied the discovery rule to claims of incest.

52

the plaintiff alleged that she was coerced into sexual relations with a priest and filed claims against the priest and also against the Archdiocese for negligent hiring, retaining, training and supervision. *Pritzlaff,* 194 Wis. 2d at 306–07. Twenty-seven years had passed since the end of the alleged relationship between the plaintiff and the priest, and therefore, one of the issues was whether the statute of limitations had been tolled during that time. *Id.* at 312. We explained that the discovery rule "tolls the statute of limitations until the plaintiff discovers or with reasonable diligence should have discovered that he or she has suffered actual damage due to wrongs committed by a particular, identified person." *Id.* at 315–16 (citations omitted). Since Pritzlaff knew both the identity of the tortfeasor and the injurious conduct, we determined that she could have alleged her complete cause of action by the time the relationship ended, and therefore, the claims were time barred. *Id.* at 316–17.

¶ 22. In *BBB Doe,* one or more of the plaintiffs alleged claims against the Archdiocese "for negligent training, placement, and supervision of the priest, liability under the doctrine of apparent authority, and for breach of duty under Wis. Stat. § 48.981 [(1995–96)] to report abuse and mitigate harm." *BBB Doe,* 211 Wis. 2d at 322. During our review, we explained a plaintiff's duty to conduct due diligence under the discovery rule:

> Plaintiffs have a duty to inquire into the injury that results from tortious activity. The measure of diligence required of a plaintiff to discover the elements of his or her cause of action is such diligence as the great majority of persons would use in the same or similar circumstances. Plaintiffs may not ignore means of information reasonably available to them, but must in good faith apply their attention to those particulars

> which may be inferred to be within their reach. . . . If the plaintiff has information providing the basis for an objective belief as to his or her injury and its cause, he or she has discovered the injury and its cause.

*Id.* at 340–41 (citations omitted). Applying the discovery rule in that case, we concluded as a matter of law that each of the five "plaintiffs discovered or, in the exercise of reasonable diligence, should have discovered" their injury and the cause thereof at least by the time of the last incident of assault. *Id.* at 342. We noted that "[a]s we recognized in *Pritzlaff,* actionable injury flows immediately from a nonconsensual, intentional sexual touching. While the plaintiffs may not have known the extent of their injuries at the time of the sexual assaults, in Wisconsin accrual of an action is not dependent upon knowing the full extent of one's injuries." *Id.* at 343–44 (citing *Pritzlaff,* 194 Wis. 2d at 317). Accordingly, we decided "as a matter of law that the claims of these plaintiffs accrued by the time of the last incident of sexual assault." *Id.* at 346.

¶ 23. We concluded that the plaintiffs' claims "accrued by the time of the last incident of sexual assault," *id.,* even though the plaintiffs claimed that they repressed their memories of the sexual abuse. Because their recollections were delayed, they were unable to discover the identity of the abuser and the fact of the abuse until their memory had returned. *Id.* at 357. We reasoned that:

> [I]t would be contrary to public policy, and would defeat the purposes of limitations statutes, to allow claims of repressed memory to invoke the discovery rule and to indefinitely toll the statutory limitations for these plaintiffs. We hold that a claim of repressed memory of past sexual abuse does not delay the accrual of a cause of action for non-incestuous sexual assault, regardless

> of the victim's minority and the position of trust occupied by the alleged perpetrator.

*Id.* at 364.

¶ 24. While our discussion in *BBB Doe* focused on the direct claims against the priests, we extended our analysis to the claims of negligent supervision against the Archdiocese, which we held were derivative claims.[11] We explained that we were not addressing the statute of limitations relative to the plaintiffs' claims based on negligent employment theories because "[p]laintiffs' derivative causes of action against the Archdiocese and the churches accrued at the same time that the underlying intentional tort claims accrued, and similarly would be barred by the statute of limitations." *Id.* at 366 (citing *Pritzlaff,* 194 Wis. 2d at 312).

¶ 25. We note that in *Pritzlaff* we decided that the discovery rule did not save the plaintiff's claims against the priest and that the claim for negligent supervision

---

[11] A derivative claim is one "that derives from, grows out of, or results from an earlier or fundamental state or condition." *Webster's Third New International Dictionary Unabridged* 608 (1961 ed.). For example, a derivative action is a suit by a shareholder to enforce a corporate cause of action based on a right of the corporation. Wis. Stat. § 180.0740(2). Accordingly, a claim against an employer for negligent supervision of an employee is derivative of an employee's wrongful act that causes injury to another, which wrongful act is alleged to have been caused by the employer's negligence. *Miller v. Wal-Mart Stores, Inc.,* 219 Wis. 2d 250, 267–68, 580 N.W.2d 233 (1998). A claim for negligent supervision by an employer contrasts with a claim of fraud by an employer, which is not a derivative claim. The contrast is demonstrated by the elements of the fraud claim. For example, proof of a claim based on fraud does not require proof of a wrong by an employee that causes injury to another. *Kaloti Enters., Inc. v. Kellogg Sales Co.,* 2005 WI 111, ¶ 12, 283 Wis. 2d 555, 699 N.W.2d 205.

accrued against the Archdiocese on the same date as those against the priest. *Pritzlaff,* 194 Wis. 2d at 312. At the time of our decision in *Pritzlaff,* we assumed, without deciding, that a claim for negligent hiring, training and supervision existed in Wisconsin. *Id.* at 325–26. We looked to opinions from other jurisdictions for the elements of such a claim. *Id.* at 326. We reasoned that if such a claim existed in Wisconsin, Pritzlaff would have to prove that the Archdiocese was negligent in hiring or retaining the priest because he was unfit for the role of a priest. *Id.* We explained that the First Amendment of the United States Constitution prevents Wisconsin courts from determining what makes a person competent to serve as a Catholic priest. *Id.* Therefore, we concluded that even if the plaintiff's negligent supervision claims were not time-barred, the claims were prohibited by the First Amendment to the United States Constitution. *Id.*

¶ 26. In *BBB Doe,* we relied on *Pritzlaff* for its discussion of the discovery rule as applied to claims of sexual assault. *BBB Doe,* 211 Wis. 3d at 336–38. We then concluded that because the negligent supervision claims were derivative of the claims against the priests for sexual assault, they were also barred by the statute of limitations. *Id.* at 366.

¶ 27. In *L.L.N. v. Clauder,* 209 Wis. 2d 674, 563 N.W.3d 434 (1997), we also addressed a claim for negligent supervision of a priest that was brought against the Diocese of Madison. We assumed that a claim for negligent supervision existed in Wisconsin, as we did in *Pritzlaff. Id.* at 685. However, we refused to reach that claim because we concluded that the case involved sexual contact between two consenting adults, and therefore, a priest's vow of celibacy could be involved. *Id.* at 695–96. We reasoned that a civil court "has

56

no authority to determine or enforce standards of religious conduct and duty" and held that the First Amendment precluded L.L.N.'s claim for negligent supervision. *Id.* at 696.

¶ 28. In the case before us, we do not address whether the First Amendment prohibits the negligent supervision or fraud claims because the issue was not brought to us. The Archdiocese explicitly stated in its brief that "there are no First Amendment grounds or issues presented on this record or appeal." The Archdiocese maintained the same position when questioned about First Amendment defenses during oral argument. Nevertheless, we are not unmindful of the conclusions we reached in *BBB Doe, Clauder* and *Pritzlaff* relative to claims of negligent supervision.

¶ 29. The plaintiffs herein contend that *BBB Doe, Clauder* and *Pritzlaff* are not controlling because the law regarding negligent employment and supervision has evolved since those decisions. The plaintiffs also argue that an employer's torts are not derivative, but independent of a plaintiff's underlying claim against an employee who caused the injury. They rely on *Miller v. Wal-Mart Stores, Inc.,* 219 Wis. 2d 250, 267–68, 580 N.W.2d 233 (1998).

¶ 30. In *Miller,* we recognized that in Wisconsin a claim for negligent supervision is a "valid claim." *Id.* However, a review of our jurisprudence prior to and subsequent to *Miller* demonstrates that *Miller* in no way undermines or overrules our holdings in *BBB Doe, Clauder* or *Pritzlaff.*

¶ 31. Prior to *Miller,* we had not decided whether a common law claim against an employer for negligent hiring, training or supervision of an employee could be maintained in Wisconsin courts. *Id.* at 259. Our decision in *Miller* does not mention *BBB Doe,* nor does it

opine whether the tort of negligent hiring, training or supervision of an employee is, or is not, a derivative claim of the underlying wrongful conduct of the employee. However, we did say in *Miller* that in order for a claim of negligent hiring, training or supervision to arise against an employer, there must be wrongful conduct by an employee. *Id.* at 263. And finally, since the employee in *Miller* was not a priest employed by an archdiocese, the First Amendment was not mentioned.

¶ 32. We also recognize that there are cases describing the claim of negligent supervision as a claim that focuses on conduct that is separate from the underlying wrongful act of the employee. *See, e.g., Doyle v. Engelke,* 219 Wis. 2d 277, 291 n.6, 580 N.W.2d 245 (1998) ("While negligent supervision does require an underlying wrong to be committed by [an] employee as an element, the tort actually focuses on the tortious, i.e., negligent, conduct of the employer."); *Clauder,* 209 Wis. 2d at 698–99 n.21 (reasoning that "liability does not result solely because of the relationship of the employer and employee, but instead because of the independent negligence of the employer"). However, *Doyle* and *Clauder* were not determining whether negligent supervision was or was not a derivative claim for purposes of determining whether the statute of limitations bars the action.

¶ 33. For example, in *Doyle,* we were deciding whether an insurer had a duty to defend its insured against claims of negligent supervision. *Doyle,* 219 Wis. 2d at 291 n.6. We were explaining that the insurer's argument that it did not have to defend the claim on vicarious liability grounds was not persuasive because the claim for negligent supervision was not a claim based on vicarious liability. *Id.* at 291–92. We also said that while the intentional acts exclusion in the

policy may exempt the insurer from defending the individual employees for what was characterized as intentional conduct, the tort of negligent supervision focused on the negligence of the employer. *Id.* at 291. As with *Miller,* in *Doyle,* we did not mention *BBB Doe,* and we did not discuss whether a claim of negligent supervision was or was not derivative of the underlying wrong of the employee.

¶ 34. In *Clauder,* the language to which the plaintiffs refer arose when we were explaining that a tort claim for negligent supervision was distinct from a tort claim for vicarious liability because vicarious liability is based on principles of agency that are not implicated in claims of negligent supervision. *Clauder,* 209 Wis. 2d at 698–99 n.21.

¶ 35. *Clauder* was released on May 23, 1997 and *BBB Doe* was released one month later on June 27, 1997. Therefore, any argument that *Clauder* is persuasive authority for the proposition that a claim of negligent supervision is not a derivative claim as we said it was in *BBB Doe* is unavailing.

■■■■■■

¶ 36. Accordingly, we conclude that *BBB Doe* and *Pritzlaff* control the outcome of the claims for negligent supervision that are before us. They are controlling precedent that have decided that the claims of negligent supervision made here are derivative of the underlying sexual molestations by the priests. As such, those claims accrued, as a matter of law, by the time of the last incident of sexual assault. For the Does, this would be no later than 1976 and for Linneman, it would be no later than 1982. As all claims for negligent supervision accrued at least 23 years before the complaints were filed, the tolling periods due to the plaintiffs' minorities are of insufficient length to save them. Furthermore,

even though the plaintiffs contend that their injuries and the cause thereof were not discovered until recently due to psychological coping mechanisms, the statute of limitations is not tolled based on claims of repressed memories. *BBB Doe,* 211 Wis. 2d at 357. Therefore, the claims for negligent supervision are barred by the statute of limitations for negligence, as applied in prior controlling precedent.

2. Fraud

¶ 37. The statute of limitations for an action based on fraud is six years, regardless of whether the claim accrued in the mid-1970s or any time thereafter. Wis. Stat. § 893.93(1)(b); *see, e.g.,* Wis. Stat. § 893.19(1) (1973–74). As with the statute of limitations for negligent supervision, this statute would be tolled for one or two years after the person who brings the claim reaches the age of 18, if the injury occurred during the minority of the claimant. Wis. Stat. § 893.33 (1975–76); Wis. Stat. § 893.16. Based on this statute of limitations, unless the claims for fraud accrued within six years of when the complaints were filed in 2005, the claims are barred. Accordingly, we must examine when the claims for fraud accrued. However, before we analyze claim accrual for fraud, we decide whether the plaintiffs sufficiently allege all of the elements of a claim based on fraud.

a. Fraud allegations

¶ 38. A claim for intentional misrepresentation requires proof that:

60

(1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to his/her detriment.

*Kaloti,* 293 Wis. 2d 555, ¶ 12.[12] The allegations of fraud in the complaints that are before us are of two types: (1) alleged affirmative representations that the priests did not have a history of molesting children and that they were not a danger to children; and (2) alleged failures to disclose the material fact that each priest had a history of sexual molestation of children. Either an affirmative representation or a failure to disclose, when there is a duty to disclose, can support a claim of intentional misrepresentation. *Id.,* ¶ 13.

¶ 39. We note that Wis. Stat. §§ 802.02 and 802.03 set forth the requirements of pleadings generally and pleadings for claims of fraud. Section 802.02(1)(a) requires "[a] short and plain statement of the claim." However, § 802.03(2), pertaining to pleadings for fraud, states "the circumstances constituting fraud or mistake shall be stated with particularity." We have interpreted

---

[12] We have concluded that a party to a business transaction has a duty to disclose a fact when:

(1) the fact is material to the transaction; (2) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact.

*Kaloti,* 283 Wis. 2d 555, ¶ 20.

this statute to require that "allegations of fraud must specify the particular individuals involved, where and when misrepresentations occurred, and to whom misrepresentations were made." *Id.,* ¶ 21.

### i. Affirmative representations

¶ 40. As affirmative factual representations, the Doe plaintiffs allege that the Archdiocese represented that it did not know that Widera had a history of molesting children and it did not know he was a danger to children. The Doe plaintiffs allege the Archdiocese did so by its responses to parishioners' letters wherein it affirmed the parishioners' positive comments about Widera's frequent interactions with children. For example, on February 12, 1974, the Vice President of the St. Andrew School Board wrote:

> The children in our school literally follow him (Widera) around, he is so kind and shows so much interest in them.

On February 19, 1974, the Reverend John J. Theisen, Executive Secretary for the Archdiocese, responded:

> We are most happy to hear that you are so pleased with Father Sig Widera. We are happy to hear that he is doing well in the school and shows so much interest in the children.

The Doe plaintiffs' complaints attach and incorporate these letters and other documents showing that Widera was convicted of a violation of Wis. Stat. § 944.17 (1973–74) (sexual perversion) on August 13, 1973. It is alleged that the Archdiocese knew of this conviction when it responded in a reaffirming manner to the parishioners' letters.

¶ 41. The Doe and Linneman complaints also allege that the Archdiocese's act of placing the priests in parishes with unsupervised access to children constituted affirmative representations that the Archdiocese did not know that the priests had a history of sexually molesting children and that the Archdiocese did not know the priests were a danger to children. For example, the Doe plaintiffs' complaints allege:

> 34. By placing Siegfried Widera at St. Andrews in Delavan, the Archdiocese affirmatively represented to minor children and their families at the parish, including [the] Plaintiffs [] and their families, that Siegfried Widera did not have a history of molesting children, that Defendant Archdiocese did not know that Siegfried Widera had a history of molesting children and that Defendant Archdiocese did not know that Siegfried Widera was a danger to children.
>
> . . . .
>
> 36. Particularly, Defendant Archdiocese knew that Siegfried Widera had sexually molested numerous children and that Siegfried Widera was a danger to children before Widera molested [] Plaintiff[s].
>
> . . . .
>
> 50. Defendant Archdiocese knew that Siegfried Widera had a history of sexually molesting children before Plaintiff[s].

(*See* John Doe 1 Compl.) Similar allegations are made in Linneman's complaint relative to the Archdiocese's representations about Becker.

¶ 42. We have held that acts can be the equivalent of a representation. *Scandrett v. Greenhouse,* 244 Wis. 108, 113, 11 N.W.2d 510 (1943). In *Scandrett,* the attorney who had represented Greenhouse in a prior

suit received an offer to settle the entire suit, including a subrogated claim, for $250. *Id.* at 110. He responded to the offer by saying he would have to check with the insurance carrier in regard to its position on settling the subrogated claim. *Id.* The attorney later accepted the check without further comment. *Id.* However, when he accepted the check, he had not contacted the insurance carrier, and he did not pay its claim. *Id.* at 110–11. Later, when the insurance carrier sued to collect its $41.20 subrogated claim, there was a question about whether the attorney's act of accepting the check could be construed as an affirmative representation sufficient to support a claim for fraud. *Id.* at 111. We concluded that it did and explained:

> It is not necessary for a person to make oral misrepresentation of fact in order to be guilty of fraudulent conduct,—such representations may be made by the acts or conduct of the party. The rule is stated in 1 Bigelow, Fraud, p. 467:
>
> "Any conduct capable of being turned into a statement of fact is a representation. There is no distinction between misrepresentations effected by words and misrepresentations effected by other acts."

*Id.* at 113 (citations omitted).

¶ 43. Courts of other jurisdictions also have recognized that affirmative representations may, under certain circumstances, be made by non-verbal conduct. *See, e.g., Haberstick v. Gordon A. Gundaker Real Estate Co.,* 921 S.W.2d 104, 109 (Mo. Ct. App. 1996) (concluding that conduct undertaken to mislead may satisfy an affirmative representation); *Bedell v. Daugherty,* 242 S.W.2d 572, 575 (Mo. 1951) (concluding "[a] misrepresentation may be made by conduct calculated to mislead and to

fraudulently obtain an undue advantage"); *Guaranty Bond State Bank of Mt. Pleasant v. Kelley,* 13 S.W.2d 69, 71 (Tex. Comm'n App. 1929) (concluding that even if the husband consummated the deal with the bank, the wife's conduct "amounted to an affirmative representation that she and her husband had, in good faith, conveyed the homestead and reserved the lien thus assigned to the bank").

¶ 44. Here, all the plaintiffs allege that the Archdiocese's act of placing the priests in parishes where they had unsupervised access to children affirmatively represented to the minor children and their families that the Archdiocese did not know the priests had a history of molesting children and that the Archdiocese did not know the priests were a danger to children. Because acts can constitute representations of fact, based solely on the allegations in the complaints before us, we cannot conclude that such acts as are described in the complaints are not sufficient to constitute an affirmative representation.

¶ 45. The other four elements of intentional misrepresentation were also pled by the plaintiffs. First, the plaintiffs allege that the affirmative representations that the Archdiocese did not know of the priests' history of molestation and that the Archdiocese did not know the priests were a danger to children were untrue. Second, the plaintiffs allege that the Archdiocese knew the representations were untrue when made.[13]

_____

[13] The Doe plaintiffs' complaints state that Widera had been criminally convicted of child molestation and the Archdiocese knew of the conviction. The complaints also state that the Archdiocese received a letter detailing comments of a priest that

¶ 46. Third, the complaints allege the Archdiocese intended to deceive the plaintiffs and induce them to act on the representations by not telling the parishioners of Widera's criminal conviction of sexually molesting a minor boy and of Becker's history of sexually molesting children.

¶ 47. Fourth, the plaintiffs allege that they relied on such representations because the defendants were in positions of superiority and influence, which caused them to be sexually molested and suffer damages. Therefore, we conclude that the plaintiffs have alleged facts sufficient to state claims for fraud.

worked at the parish Widera worked at when criminally convicted. The letter stated that a male grade school teacher who saw Widera "fooling around with the boys of another teacher" told the priest that if Widera "fooled around in the same way with his students, he would punch Father in the face"; that parishioners had come forward after the criminal conviction and reported incidents they had noticed and warnings they gave to their own children; and that Widera would shower all in the nude with boys and then "[w]hen an adult male entered the shower, Fr. Siegfried covered himself with a towel."

Linneman alleged that the Archdiocese knew Becker had sexually molested numerous children and that he was a danger to children. Linneman's complaint states that Becker fondled the genitals and attempted to sodomize a minor boy on approximately ten separate occasions from 1971 to 1972 in Milwaukee, Wisconsin, and in approximately 1978, fondled another boy numerous times in California. The pastor at the church in California asked that Becker be transferred back to Milwaukee. Linneman's complaint also states that the Archdiocese received a report from two parishioners in 1980 that Becker had "an unfortunate incident" with a teenage boy, whereupon the Archdiocese sent Becker to therapy and transferred him to another parish. Linneman's complaint also states the Archdiocese received other complaints from concerned parents regarding Becker's inappropriate behavior with children.

### ii. Failure to disclose

¶ 48. The complaints also alleged fraud through the Archdiocese's failure to disclose the fact that the priests had histories of sexual abuse of children. In general, silence or a failure to disclose a fact is not an intentional misrepresentation unless the person has a duty to disclose. *Kaloti*, 283 Wis. 2d 555, ¶ 13; *Doe 676C*, 284 Wis. 2d 307, ¶ 49; *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 26, 288 N.W.2d 95 (1980). "If there is a duty to disclose a fact, failure to disclose that fact is treated in the law as equivalent to a representation of the nonexistence of the fact." *Ollerman*, 94 Wis. 2d at 26. Therefore, whether non-disclosure can satisfy an element of fraud turns on whether the Archdiocese had a duty to disclose to the plaintiffs the fact that the priests had histories of sexual molestation of children.

¶ 49. Although the question of whether a legal duty exists is a question of law, *id.* at 27, it is an extremely complex question that may have factual components that make it unsuitable to address on a motion to dismiss. When we review a motion to dismiss, we may, but we are not compelled to, address whether the complaint states more than one claim for relief. *Attoe v. Madison Prof'l Policemen's Ass'n*, 79 Wis. 2d 199, 205, 255 N.W.2d 489 (1977). Because we have concluded that the plaintiffs' allegations of affirmative fraudulent misrepresentations are sufficient, we do not address the sufficiency of the plaintiffs' fraudulent misrepresentation claims based on failures to disclose Widera's and Becker's histories of sexually molesting children that were known to the Archdiocese prior to the sexual abuse of the plaintiffs.

### iii. Accrual of fraud claims[14]

¶ 50. Since we conclude that claims for fraud against the Archdiocese based on intentional misrepresentations are sufficiently pled, we now determine whether such claims are barred by the statute of limitations. The claims for fraud based on intentional misrepresentations are distinguishable from negligent supervision claims. As we explained above, fraud claims are not derivative claims, but rather, intentional torts where the wrongful act is the Archdiocese's *fraudulent representation that it did not know of the priests' histories of sexually molesting children and that it did not know the priests were dangerous to children.* Fraud claims, if proven, provide a separate cause of the plaintiffs' injuries.[15]

---

[14] Our opinion in *BBB Doe* did not address intentional misrepresentation. *BBB Doe,* 211 Wis. 2d at 319 (explaining that the plaintiffs alleged claims against the Archdiocese for "negligent employment, training and supervision of the defendant priests, and for failure to report the abuse"). Our opinion in *BBB Doe* also contains no discussion of the statute of limitations for fraud, as it would have if the viability of a fraud claim had been analyzed. We point this out because there has been some confusion about whether *BBB Doe* addressed claims of fraud (intentional misrepresentation) by the Archdiocese. It did not.

[15] As we explained above, the reason the negligent supervision claims accrue at the same time as the underlying sexual assault claims is because when sexual assault by a priest is alleged, the negligent supervision claims are derivative causes of action to the underlying intentional tort claims. *BBB Doe,* 211 Wis. 2d at 366. No claim for intentional misrepresentation was made in *BBB Doe.*

¶ 51. The statute of limitations for fraud codifies the discovery rule and states: "The cause of action in such case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud." Wis. Stat. § 893.93(1)(b). We explained the discovery rule as it pertains to fraud as follows:

> Actual and complete knowledge of the fraud on the part of the plaintiff is not necessary in order to set the limitation period running.
>
> When the information brought home to the aggrieved party is such as to indicate where the facts constituting the fraud can be effectually discovered upon diligent inquiry, it is the duty of such party to make the inquiry, and if he fails to do so within a reasonable time he is, nevertheless, chargeable with notice of all facts to which such inquiry might have led.
>
> . . .
>
> Under the rule quoted above, it is not necessary that a defrauded party have knowledge of the ultimate fact of fraud. What is required is that it be in possession of such essential facts as will, if diligently investigated, disclose the fraud. The burden of diligent inquiry is upon the defrauded party as soon as he has such information as indicates where the facts constituting the fraud can be discovered.

*Koehler v. Haechler,* 27 Wis. 2d 275, 278, 133 N.W.2d 730 (1965) (internal quotations and citations omitted).

¶ 52. In *Koehler,* we concluded that a stock purchaser was not barred by the statute of limitations from claiming fraud in the sale of corporate stock allegedly in excess of the number of shares authorized because no fact was presented that should have alerted the purchaser to look to the probate proceeding for information

69

regarding ownership of shares prior to when he did so. *Id.* at 278–79. Here, the complaints set out no fact that should have alerted the plaintiffs to attempt to discover whether the Archdiocese knew that the priests had prior histories of sexual abuse of children.[16]

¶ 53. The court of appeals applied the discovery rule to a fraud claim in *Stroh Die Casting Co. v. Monsanto Co.,* 177 Wis. 2d 91, 502 N.W.2d 132 (Ct. App. 1993). The plaintiff in *Stroh* was a hydraulic fluid user that brought a products liability action against the manufacturer, Monsanto, alleging the fluid was defective due to high polychlorinated biphenyl compounds (PCBs).[17] *Id.* at 98. Monsanto moved for summary judgment, claiming that the cause of action was time barred. *Id.* at 99. The court of appeals noted that the "date of discovery" is generally a question of fact for the jury and is a question of law only where the facts are undisputed. *Id.* at 104. The parties in *Stroh* agreed that for purposes of claim accrual, "it is not necessary that a defrauded party have knowledge of the ultimate fact of fraud. What is required is that it be in possession of such essential facts as will, if diligently investigated, disclose the fraud." *Id.* at 117–18 (quoting *Milwaukee W. Bank v. A.A. Lienemann,* 15 Wis. 2d 61, 65, 112 N.W.2d 190 (1961)).

---

[16] Although voluminous submissions were made after we accepted review of this case, they may not be used in the motion to dismiss the complaints for failing to state a claim because that motion tests only the legal sufficiency of the complaint. *BBB Doe,* 211 Wis. 2d at 331.

[17] PCBs (polychlorinated biphenyls) "are toxic [compounds that] persist in the environment, and tend to accumulate in the food chains of both human beings and animals." *Stroh Die Casting Co. v. Monsanto Co.,* 177 Wis. 2d 91, 97, 502 N.W.2d 132 (Ct. App. 1993).

¶ 54. The court of appeals in *Stroh* concluded that the action was time barred under Wis. Stat. § 893.93(1)(b). With the enactment of Chapter NR 157 of the Wisconsin Administrative Code in September 1977, entitled "Management of PCBs and Products Containing PCBs," Stroh had to incur substantial expenses for PCB testing and incineration due to its continued use of PCBs in its hydraulic fluids. *Id.* at 118–19. The regulation also alerted the user "to the pervasiveness and persistence of PCB-containing products in the environment." *Id.* Furthermore, the user noted that the problems associated with PCB-containing products created "tremendous public outcry throughout the mid-1970s." *Id.* Therefore, the court of appeals concluded that "[a]s of September 1977, a conscientious enterprise in the position of Stroh should have become suspicious of Monsanto's [representation] that its Pydraul fluids could continue to be used in Stroh's die casting operation." *Id.* at 119. Since the court of appeals concluded that had Stroh "diligently investigated the facts known to it [in] September 1977, the alleged fraud on the part of Monsanto would have been discovered." *Id.* Accordingly, Stroh's intentional misrepresentation claim was time barred. *Id.*

¶ 55. *Stroh* does not provide sufficient support to cause us to dismiss the fraud claims for at least three reasons. First, *Stroh* was decided after motions for summary judgment and a full trial for factual development. *Id.* at 99. In contrast, the case now before us presents as a motion to dismiss where the only facts developed are those stated in the complaints or the reasonable inferences that flow from facts pled. *BBB Doe,* 211 Wis. 2d at 331. Second, Stroh's failure to comply with federal regulations in regard to PCB disposal was a cause of its injuries. *Stroh,* 177 Wis. 2d at

112. By contrast, none of the children who was assaulted by Widera and Becker did anything to cause their own injuries. Third, reasoning about the investigation that reasonably may be required in a business context is not directly transferable to a relationship that is based on trust, particularly when the trust relationship arises in a religious context such as that of priest and parishioner. Therefore, it does not follow from the fact of being sexually molested that any plaintiff would suspect that the Archdiocese knew that the priests had prior histories of sexual molestation of children and yet placed them in the position where they would molest more children.

¶ 56. It also has been argued that we should follow the reasoning of the Utah Court of Appeals in *Colosimo v. Roman Catholic Bishop of Salt Lake City*, 104 P.3d 646 (2004) and dismiss the fraud claims because the plaintiffs should have discovered the Archdiocese's fraud long before the statute of limitations on fraud had run. We decline the invitation to do so.

¶ 57. In *Colosimo*, the plaintiffs brought suit against the Bishop of Salt Lake City, d/b/a the Catholic Diocese of Salt Lake City, and other archdioceses (the Bishop) grounded in their sexual assaults by a parish priest. *Id.* at 649. Fraud was one of the claims alleged against the Bishop. *Id.* The trial court dismissed all claims on summary judgment. *Id.* at 650. The court of appeals affirmed the dismissal based on its conclusion that the trial court had correctly interpreted the Utah statute of limitations as barring all claims. *Id.* at 652. It concluded that because the plaintiffs knew at the time of the sexual assault that they were injured by the priest and because they knew of the priest's relationship to the other defendants, they were required after turning 18 years of age to "exercise reasonable diligence" in discovering whether they had claims against the Bishop. *Id.* at 653.

¶ 58. *Colosimo* is not persuasive. Initially, we note that *Colosimo* is a summary judgment decision where facts outside of the pleadings were considered by the court in coming to its conclusions. *Id.* at 650. We have not considered facts outside of the pleadings and the reasonable inferences therefrom, when deciding the case now before us. *BBB Doe*, 211 Wis. 2d at 331. Furthermore, *Colosimo* does not give any reason for its conclusion that the assaulted children on reaching majority should have investigated whether the Bishop knew of the priest's history of sexually assaulting children before the Bishop placed the priest in the parishes where he assaulted Colosimo. Accordingly, as we review the complaints before us, we conclude they do not provide a basis from which we can conclude, as a matter of law, that a reasonable person in the position of the plaintiffs should have investigated whether the Archdiocese knew of Widera's and Becker's prior sexual molestations of children and yet placed them in positions where they could sexually molest more children.

¶ 59. The Archdiocese also contends that the statute of limitations for sexual abuse of a child, Wis. Stat. § 893.587, demonstrates that the legislature's public policy is to toll the statute of limitations for the plaintiffs' claims no later than their 35th birthday.[18] Wisconsin Stat. § 893.587 states:

> An action to recover damages for injury caused by an act that would constitute a violation of s. 948.02, 948.025, 948.06, 948.085, or 948.095 or would create a cause of

---

[18] We did not address this contention under the claim for negligent supervision because we concluded those claims accrued at the time of abuse in the mid-1970s or 1982 and were barred by the statute of limitations then in effect. Wisconsin Stat. § 893.587 was not created until 2003 and did not take effect until May 2004. 2003 Wis. Act 279, § 6.

action under s. 895.442 shall be commenced before the injured party reaches the age of 35 years or be barred.

¶ 60. The statutes listed in Wis. Stat. 893.587 refer to acts of sexual assault, incest, or sexual exploitation.[19] The act that the complaints allege caused injury is the Archdiocese's fraudulent misrepresentation, i.e., the representation that the Archdiocese did not know the priests had histories of sexually abusing children and did not know the priests were dangerous to children. None of the statutes listed in § 893.587 refers to fraudulent misrepresentations. Therefore, the statute does not apply to these claims of fraud.

¶ 61. We do recognize the important policy consideration of protecting defendants from defending stale claims, when witnesses and relevant evidence may be unavailable. *BBB Doe,* 211 Wis. 2d at 334. However, we also recognize that tort victims should be given a fair opportunity to enforce legitimate claims against wrongdoers. *Id.*

¶ 62. Keeping these policy considerations in mind, we deny the motion to dismiss the fraud claims because we conclude that, based solely on the complaints, we cannot determine when the plaintiffs knew or should have known of the Archdiocese's alleged

---

[19] Wisconsin Stat. § 948.02 refers to "[s]exual assault of a child"; Wis. Stat. § 948.025 refers to "[e]ngaging in repeated acts of sexual assault of the same child"; Wis. Stat. § 948.06 refers to "[i]ncest with a child"; Wis. Stat. § 948.085 refers to "[s]exual assault of a child placed in substitute care"; Wis. Stat. § 948.095 refers to "[s]exual assault of a child by a school staff person or a person who works or volunteers with children"; and Wis. Stat. § 895.442 refers to "[s]exual exploitation by a member of the clergy."

knowledge of the priests' past histories of sexual molestation of children. Therefore, their claims may or may not be time-barred by Wis. Stat. 893.93(1)(b), depending on when the claims for fraud accrued. The date of discovery is usually a question of fact. *See Borello,* 130 Wis. 2d at 404. However, if the facts are not in dispute or if there is only one reasonable inference to be drawn from them, determination of the date of discovery is a question of law that we will review independently. *See Vocational, Technical Adult Educ., Dist. 13 v. DILHR,* 76 Wis. 2d 230, 240, 251 N.W.2d 41 (1977).

¶ 63. Since a motion to dismiss does not present the opportunity to fully develop the facts surrounding the Archdiocese's argument that plaintiffs' fraud claims accrued more than six years before the date on which they were filed, we conclude that the claims for fraud survive the motion to dismiss. However, we want to clarify that we are not precluding summary judgment if undisputed facts demonstrate that the claims for fraud accrued more than six years prior to the dates on which the claims were filed.

## III. CONCLUSION

¶ 64. We conclude that the claims asserted against the Archdiocese for negligent supervision are barred by the statute of limitations because according to controlling precedent such claims are derivative and accrued as a matter of law by the time of the last incident of sexual assault. However, we also conclude that the claims of fraud for intentional misrepresentation are independent claims based on the Archdiocese's alleged knowledge of the priests' prior sexual molestation of children and the Archdiocese's intent to deceive children and their families. We further conclude that the date of the accrual of the fraud claims is "when the

plaintiffs discovered or, in the exercise of reasonable diligence, should have discovered" that the Archdiocese's alleged fraud was a cause of their injuries. *BBB Doe*, 211 Wis. 2d at 340. This determination cannot be resolved by a motion to dismiss the complaints. Therefore, we affirm the dismissal of the negligent supervision claims; we reverse the dismissal of the fraud claims; and we remand for further proceedings.

*By the Court.*—The decision of the court of appeals is affirmed in part; reversed in part and remanded to the circuit court.

¶ 65. SHIRLEY S. ABRAHAMSON, C.J. (*concurring in part, dissenting in part*). This case involves two types of claims against the Archdiocese of Milwaukee: negligent supervision and fraud. The plaintiffs, now adults, allege that as children they were sexually abused by Roman Catholic priests and that the defendant, the Archdiocese of Milwaukee, negligently supervised the priests and committed fraud by not disclosing information about, and by actively covering up, previous incidents of sexual abuse by the priests. The Archdiocese asserts that these claims are barred by the statute of limitations because the last sexual assault occurred 29 years prior to the commencement of the lawsuit.

¶ 66. I agree with the majority opinion that "the claims of fraud for intentional misrepresentation are independent claims based on the Archdiocese's alleged knowledge of the priests' prior sexual molestation of children and the Archdiocese's intent to deceive children and their families." Majority op., ¶ 2. I further agree that "the date of the accrual of the fraud claims is 'when the plaintiffs discovered or, in the exercise of

reasonable diligence, should have discovered' that the Archdiocese's alleged fraud was a cause of their injuries." Majority op., ¶ 2 (quoted source omitted). I join that part of the majority opinion that remands the cause to the circuit court for further proceedings on the plaintiffs' fraud claims.

¶ 67. I cannot, however, join that part of the opinion that affirms the dismissal of the plaintiffs' negligent supervision claims. I do not agree that the "claims asserted against the Archdiocese for negligent supervision are barred by the statute of limitations because according to controlling precedent such claims are derivative and accrued as a matter of law by the time of the last incident of sexual assault." Majority op., ¶ 2. I think the majority opinion turns the case law on its head.

¶ 68. I reason as follows: (I) the majority opinion's classification of the tort of negligent supervision as "derivative" does not comport with traditional understandings of "derivative claims"; (II) the controlling precedent, the *Miller*[1] and *Doyle*[2] cases, is clear that claims brought against an employer for negligent supervision are independent claims; and (III) the *BBB Doe*[3] and *Pritzlaff*[4] cases (and similar cases) do not control.

I

¶ 69. The majority opinion holds that negligent supervision claims are "derivative claims" that accrue at

---

[1] *Miller v. Wal-Mart Stores, Inc.*, 219 Wis. 2d 250, 267–68, 580 N.W.2d 233 (1998).

[2] *Doyle v. Engelke*, 219 Wis. 2d 277, 291 n.6, 580 N.W.2d 245 (1998).

[3] *John BBB Doe v. Archdiocese of Milwaukee*, 211 Wis. 2d 312, 565 N.W.2d 94 (1997).

[4] *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 533 N.W.2d 780 (1995)

77

the time of the wrongful act of the employee, not at the time of the wrongful act of the employer.

¶ 70. The majority opinion has no trouble with the classification "derivative." I do.

¶ 71. The distinction drawn by this court between derivative and independent causes of action has not been clear or consistent. In fact, "this court has concluded that these labels [of "separate" and "derivative" claims] are not particularly useful . . . ."[5] The distinction often depends on the purpose for which the distinction is being made.[6] Moreover, our cases have reached divergent conclusions about whether a claim is derivative or not. "The concept of what is a 'separate claim' and what is a 'derivative claim' has caused this court great difficulty, and 'the cases are confusing.' "[7]

¶ 72. Even more troubling is that the majority opinion, by classifying this claim as "derivative," distorts the traditional and accepted understanding of "derivative claims." The Restatement (Third) of Torts instructs that "derivative claims" occur "where a plaintiff claims injury due to the defendant's tortiously

---

[5] *Theama v. City of Kenosha,* 117 Wis. 2d 508, 527, 344 N.W.2d 513 (1984).

[6] *See Finnegan ex rel. Skoglind v. Wis. Patients Comp. Fund,* 2003 WI 98, ¶ 44 n.9, 263 Wis. 2d 574, 666 N.W.2d 797 (Abrahamson, C.J., concurring) (discussing how the characterization depends on whether the court is addressing contributory negligence, limits on amount of recovery, or statutes of limitations).

[7] *Wangen v. Ford Motor Co.,* 97 Wis. 2d 260, 316, 294 N.W.2d 437 (1980) (quoted source omitted). In *White v. Lunder,* 66 Wis. 2d 563, 574, 225 N.W.2d 442 (1975), the court confessed that "[t]o declare both of these causes of action [medical expenses for his wife and loss of consortium] derivative might not be entirely logical" but did so anyway.

78

injuring a third person."[8] The Restatement also explains that "[c]laims in which the plaintiff's recovery depends on the defendant's committing a tort against a third person are often called 'derivative claims,' " and include wrongful death claims.[9]

¶ 73. Traditionally, claims are "derivative" when one person asserts that he or she experienced damage as a result of a tort committed by a tortfeasor against another person.[10] The claim derives from the injury

---

[8] Restatement (Third) of Torts: Apportionment of Liability, § 6 cmt. b (reporter's note) (1999).

[9] Restatement (Third) of Torts: Apportionment of Liability, § 6 cmt. a (1999).

[10] *See also* Wis. Stat. § 655.007 (2005–06) which provides that "On and after July 24, 1975, any patient or the patient's representative having a claim or any spouse, parent, minor sibling or child of the patient having a derivative claim for injury or death on account of malpractice is subject to this chapter." In *Pierce v. Physicians Insurance Co. of Wisconsin, Inc.,* 2005 WI 14, ¶ 12, 278 Wis. 2d 82, 692 N.W.2d 558, the court explained the obvious application of § 655.007: "[t]here is no dispute that Pierce [the mother] has the derivative claim of a parent for the wrongful death of Brianna [her daughter] under Wis. Stat. § 655.007." In *Maurin v. Hall,* 2004 WI 100, ¶ 29, 274 Wis. 2d 28, 682 N.W.2d 866, the court also explained that "[a] parent's claim for the loss of society and companionship with a minor child is a derivative claim."

See also *State Farm Mutual Automobile Insurance Co. v. Langridge,* 2004 WI 113, ¶ 33, 275 Wis. 2d 35, 683 N.W.2d 75, discussing and agreeing with *Gocha v. Shimon,* 215 Wis. 2d 586, 573 N.W.2d 218 (Ct. App. 1997), and *Richie v. American Family Mutual Insurance Co.,* 140 Wis. 2d 51, 409 N.W.2d 146 (Ct. App. 1987), two cases that "distinguish between independent claims and derivative claims. Both conclude that when an insured seeks payment arising out of the bodily injury of another, the insured's claims are 'derivative' of the claim of the person suffering the bodily injury . . . ."

another suffers. In negligent supervision claims, however, a plaintiff asserts that he or she was directly injured by two separate persons. In a negligent supervision claim, there are two wrongs: one wrong by the employee and a separate wrong by the employer. A negligent supervision claim does not fit the traditional concept of "derivative claim."

¶ 74. The majority opinion tries to find support for its characterization of the negligent supervision claim as "derivative" by resort to corporate law, namely shareholder suits.[11] In a shareholder suit, the shareholder sues on behalf of the company for wrongs done to the company. Put another way, the shareholder is asserting the company's claim, not his or her own personal claim.[12] The analogy to shareholder suits thus does not support the treatment of a claim for negligent supervision as a derivative claim. The plaintiff with a negligent supervision claim is asserting a personal claim for a personal injury that was caused by the employer.

In *Finnegan,* 263 Wis. 2d 574, ¶ 26, a plurality of the court explained that "[o]ur jurisprudence outlines the types of claims that are considered derivative. Claims for the loss of society, companionship, and consortium are derivative even though they technically 'belong' to the close relative making the claim."

[11] The majority opinion states that "a derivative action is a suit by a shareholder to enforce a corporate cause of action based on a right of the corporation." Majority op., ¶ 24 n.11.

[12] Justice Roggensack explained in a concurring opinion that "[i]n the context of corporate law, a derivative claim for relief permits an individual shareholder to enforce a claim for relief that belongs to the corporation by claiming the action of another injured the corporation. *See Einhorn v. Culea,* 2000 WI 65, ¶ 16, 235 Wis. 2d 646, 612 N.W.2d 78." *Gottsaker v. Monnier,* 2005 WI 69, ¶ 47 n.4, 281 Wis. 2d 361, 697 N.W.2d 436 (Roggensack, J., concurring).

¶ 75. Of course, the conduct leading to the negligent supervision claim is related to the underlying wrong by the employee. But as a plurality of the court explained in *Finnegan ex rel. Skoglind v. Wisconsin Patients Compensation Fund,* 2003 WI 98, ¶ 27, 263 Wis. 2d 574, 666 N.W.2d 797, a claim can be nonderivative "although [the claim] arises from a shared set of underlying facts" as another claim. Despite the shared set of underlying facts, a plaintiff who sues for negligent supervision is asserting that he or she has been the victim of an independent *tort,* not that he or she has a separate but dependent *damages claim* deriving from a tort injury to another (as in a derivative claim such as loss of consortium or society) or from a tort injury by the employee.

¶ 76. A derivative claim does not have its own elements distinct from the negligence claim to which it attaches. For instance, juries are instructed that loss of consortium and loss of society and companionship are categories of damages, not separate negligence inquiries.[13] A claim for negligent supervision, on the other hand, has its own elements distinct from the tort claim against the employee.[14]

---

[13] *See* Wis JI—Civil 1815 (loss of consortium); 1837 (parent's loss of society and companionship); 1838 (minor child's loss of society and companionship) (all appearing in the jury instruction manual under the subheading "Damages"). Jury instructions for "Employer Negligence: Negligent Hiring, Training, or Supervision" are located in the jury instruction manual under the subheading "Other Negligence." Wis JI—Civil 1383.

[14] "A claim for negligent supervision of an employee requires the plaintiff to plead and prove all of the following: (1) the employer had a duty of care owed to the plaintiff; (2) the employer breached its duty; (3) a wrongful act or omission of an

81

¶ 77. Applying the traditional statement of the difference between derivative and independent claims, I conclude that the claim for negligent supervision is an independent claim.

## II

¶ 78. Contrary to the majority opinion, well-established precedent does *not* support the conclusion that the negligent supervision claims in the instant case are derivative actions that accrue at the time of the injury. A review of the case law makes this conclusion abundantly clear.

¶ 79. The claim of negligent supervision was not recognized by this court as a valid cause of action until 1998 in *Miller v. Wal-Mart Stores, Inc.,* 219 Wis. 2d 250, 267–68, 580 N.W.2d 233 (1998).[15]

¶ 80. The *Miller* court, 219 Wis. 2d at 262, makes clear that "there must be a nexus between the negligent hiring, training, or supervision and the act of the employee." As the court in *Miller* explained, "[w]ith respect to a cause of action for negligent hiring, training or supervision, we determine that the causal question is whether the failure of the employer to exercise

employee was a cause-in-fact of the plaintiff's injury; and (4) an act or omission of the employer was a cause-in-fact of the wrongful act of the employee." Majority op., ¶ 17. *See also* Wis JI—Civil 1383 ("Employer Negligence: Negligent Hiring, Training, or Supervision"). The elements of the tort claim against the employee are different. For instance, a battery claim would require the fact-finder to determine whether the employee intentionally caused bodily harm to the plaintiffs and that the plaintiff did not consent to the harm. Wis JI—Civil 2005 (battery).

[15] *John Doe 67C v. Archdiocese of Milwaukee,* 2005 WI 123, 284 Wis. 2d 307, ¶ 21 n.3, 700 N.W.2d 180.

due care was a cause-in-fact of the wrongful act of the employee that in turn caused the plaintiff's injury." 219 Wis. 2d at 262.

¶ 81. The employee's wrongful act, however, did not have to be actionable itself. The *Miller* court, 219 Wis. 2d at 263, explained that "we stop short of requiring an underlying tort." The court clearly set forth the elements required for a claim of negligent supervision in *Miller:* "[w]e do conclude that there must be an underlying wrongful act committed by the employee as an element of the tort of negligent hiring, training or supervision. A wrongful act may well be a tort, but not necessarily." The *Miller* court, 219 Wis. 2d at 263–64, went on to emphasize the point: The employer "should not escape liability for its negligent act or omission simply because the employee's underlying wrongful act is not an actionable tort."

¶ 82. Justice Steinmetz dissented in *Miller,* 219 Wis. 2d at 275, on the ground that he "would hold that the tort of negligent hiring, training, or supervision should include, as a necessary element, an underlying tort committed by the employee." Justice Steinmetz explained his position as follows: "Since the employee did not commit an underlying tort, the court should have simply reversed the judgment of the circuit court. The court, however, has taken it upon itself to craft a new, untested theory of law to allow this particular plaintiff to recover damages from the exonerated employee's employer." *Miller,* 219 Wis. 2d at 276 (Steinmetz, J., dissenting).

¶ 83. If there is no need for an underlying tort, how can the negligent supervision claim be derivative? What exactly is it derivative of? The majority opinion does not answer these questions, and as a result, rewrites *Miller.*

¶ 84. In *Doyle v. Engelke,* 219 Wis. 2d 277, 291 n.6, 580 N.W.2d 245 (1998), the court further discussed the nature of negligent supervision claims, making clear that negligent supervision claims are independent causes of action.

¶ 85. In *Doyle,* an employee had allegedly committed an intentional tort against the plaintiff, and the plaintiff sued the employer, claiming negligent supervision. At issue was whether the insurer had a duty to defend its insured (the employer) against claims of negligent supervision when the insurance policy exempted intentional torts from the duty to defend.[16] The circuit court and the court of appeals had concluded that the intentional acts exclusion clause of the insurance policy released the insurance company from any duty to defend for negligent supervision stemming from the intentional torts of the employee. This court reached a different conclusion.

¶ 86. This court in *Doyle* recognized that although the negligent supervision claim was related to the employee's intentional misconduct, the claim of negligent supervision was nonetheless independent and distinct from the employee's intentional tort. The *Doyle* court explained that "[w]hile negligent supervision does require an underlying wrong to be committed by the employee as an element, the tort actually focuses on the tortious, i.e. negligent, conduct of the employer." 219 Wis. 2d at 291 n.6. According to the *Doyle* court, the claim of negligent . supervision "focuses on [the employer's] negligence in supervising its employees—

---

[16] Specifically, the intentional act exclusion indicates that the insurance company " 'won't cover bodily injury . . . that's . . . intended by the protected person.' " 219 Wis. 2d at 291 (quoting insurance policy). The "protected person" was the employer.

whether or not the employees committed the underlying wrong intentionally." 219 Wis. 2d at 291.

¶ 87. The *Doyle* court further explained that the claim for negligent supervision was not a claim based on vicarious liability. 219 Wis. 2d at 291–92.

¶ 88. As in *Miller,* the decision in *Doyle* is abundantly clear that there need be no underlying tort for a claim of negligent supervision to arise. Without an underlying tort, what is a claim of negligent supervision derivative of?

¶ 89. Although the *Miller* and *Doyle* cases do not use the word "independent" or "derivative," the cases make clear that negligent supervision of an employee is an independent claim.

¶ 90. The majority opinion's attempt to distinguish the instant case from *Miller* and *Doyle* is weak and unpersuasive. The majority points out several times that the court in *Miller* and *Doyle* did not refer to *BBB Doe.* Majority op., ¶¶ 31, 33. It does not matter in the slightest that *Miller* and *Doyle* did not refer to *BBB Doe. BBB Doe* did not conclusively decide anything about negligent supervision claims. The court in *BBB Doe* avoided answering even whether negligent supervision claims existed. Why would a later case cite to *BBB Doe* in regard to negligent supervision?[17]

¶ 91. The majority opinion gives short shrift to the *Miller* and *Doyle* cases, apparently on the ground that they do not involve the Archdiocese, priests, or any religious order employers or employees of a religious order.

---

[17] The comments to the relevant jury instruction, Wis JI—Civil 1383 ("employer negligence: negligent hiring, training, or supervision"), do not refer to *BBB Doe* or *Pritzlaff.* The comments instead rely heavily on *Miller* for guidance on the elements of and nature of the tort claim.

¶ 92. The majority opinion's reliance on *Pritzlaff* and *BBB Doe* simply because they share a factual context—supervision (or lack thereof) by the Archdiocese—is misplaced. These cases did not recognize that the claim of negligent supervision existed in Wisconsin law, let alone definitively determine whether such a claim was derivative or independent or shared the same statute of limitations as a cause of action against a priest.

¶ 93. I turn to the cases involving priests and dioceses.

### III

¶ 94. The majority opinion asserts that "*BBB Doe* and *Pritzlaff* control the outcome of the claims for negligent supervision that are before us." Majority op., ¶ 36. The majority opinion states that "[t]hey are controlling precedent that have decided that the claims of negligent supervision made here are derivative of the underlying sexual molestations by the priests." *Id.* Not true!

¶ 95. *BBB Doe* and *Pritzlaff* do not control the outcome in the instant case. These cases did not decide whether a claim of negligent supervision was a derivative or independent cause of action. In fact, when these cases were decided, the court had not even recognized that a claim of negligent supervision, training, or hiring could be brought against an employer under Wisconsin law.

¶ 96. In 1995, this court decided *Pritzlaff v. Archdiocese of Milwaukee,* 194 Wis. 2d 302, 533 N.W.2d 780 (1995). The plaintiff, an adult woman, brought suit against a priest whom she claimed had coerced her into having sexual relations. The plaintiff also sued the

86

Archdiocese, claiming it was negligent in hiring, retaining, training, and supervising the priest.

¶ 97. The *Pritzlaff* court focused much of its attention and discussion on the plaintiff's direct claim against the priest. In fact, over 20 pages of the court's 35–page decision exclusively analyzed this claim.

¶ 98. When the *Pritzlaff* court finally got around to discussing the plaintiff's claim against the Archdiocese, the *Pritzlaff* court "assumed, without deciding, that a claim for negligent hiring, training and supervision existed in Wisconsin." Majority op., ¶ 25 (citing *Pritzlaff,* 194 Wis. 2d at 325–26). The assumption that the negligent supervision claim existed in Wisconsin was not the only assumption employed by the *Pritzlaff* court. The *Pritzlaff* court also "assume[d], without deciding, that the discovery rule applies to the Archdiocese."

¶ 99. The *Pritzlaff* court did not have occasion to decide whether the claim actually existed, and if so, whether it was independent or derivative of any tort committed by the priest, because of First Amendment issues. Majority op., ¶ 25 (citing *Pritzlaff,* 194 Wis. 2d at 326). The *Pritzlaff* court concluded that "the claims of negligent hiring, retaining, training and supervision are barred by the First Amendment in this case." 194 Wis. 2d at 307. *See also* 194 Wis. 2d at 326.

¶ 100. The *Pritzlaff* court never decided whether a claim of negligent supervision was viable in Wisconsin and whether the discovery rule would apply to it. The *Pritzlaff* court did not engage in any analysis of the nature of the plaintiff's claim against the Archdiocese. *Pritzlaff,* a case that made assumptions but did not decide the issue, is neither controlling nor helpful.

¶ 101. In 1997, the court again addressed negligent supervision claims brought against the Archdio-

cese in *John BBB Doe v. Archdiocese of Milwaukee,* 211 Wis. 2d 312, 565 N.W.2d 94 (1997). The plaintiffs in *BBB Doe* were adults who alleged that they were sexually molested by priests when they were children but had repressed their memories of these traumatic events. The plaintiffs brought direct claims against the priests who allegedly sexually abused them. The plaintiffs also brought claims against the churches and the Archdiocese for negligent employment, training and supervision of the priests, and for failure to report the abuse.

¶ 102. As in *Pritzlaff,* the court in *BBB Doe* focused almost exclusively on the claims brought directly against the priests. The opinion devotes over 50 pages (from 211 Wis. 2d at 312 to 211 Wis. 2d at 366) of analysis to discussing the claims against the priests.

¶ 103. Only in the "Conclusion" section of the opinion, that is, only at the very end of the majority opinion, does the court discuss the claims against the Archdiocese. The *BBB Doe* court states:

> In light of our conclusion that all seven plaintiffs' claims based on intentional sexual assault are barred by the applicable statute of limitations, we need not address their claims based on respondeat superior and negligent employment theories. Plaintiffs' derivative causes of action against the Archdiocese and the churches accrued at the same time that the underling intentional tort claims accrued, and similarly would be barred by the statute of limitations. *See Pritzlaff,* 194 Wis. 2d at 312, 533 N.W.2d 780 (statute of limitations period for actions against the Archdiocese begins on same date the cause of action accrued against the individual priest defendant).

*BBB Doe,* 211 Wis. 2d at 366. This paragraph constitutes the court's entire discussion on the subject of negligent supervision. Two sentences later is the mandate line.

¶ 104. The *BBB Doe* decision barely paid any attention to the claim against the Archdiocese. These claims were a mere afterthought in the decision, and the only support for the conclusion that the claims were "derivative" and barred by the statute of limitations was the *Pritzlaff* decision, which, as discussed above, did not decide the issue.

¶ 105. Even more telling is that the *BBB Doe* court, 211 Wis. 2d at 366, characterized the claims against the Archdiocese as "based on respondeat superior and negligent employment theories" which suggests that the court viewed these claims as grounded in vicarious liability. The court later clarified in *Miller* and *Doyle* that this view of negligent supervision claims was wrong. These later cases—which actually recognized that a claim of negligent supervision existed in Wisconsin law—explained that a claim of negligent supervision was based on the independent wrongful act of the employer.

¶ 106. If *Pritzlaff* and *BBB Doe* were based only on assumptions and speculation, how can they be controlling precedent? *Pritzlaff* and *BBB Doe* cannot and do not hold the answer to the instant case.

¶ 107. Another case, decided after *BBB Doe* and *Pritzlaff,* supports the conclusion that *BBB Doe* and *Pritzlaff* did not resolve the questions surrounding negligent supervision claims. *John Doe 67C v. Archdiocese of Milwaukee,* 2005 WI 123, 284 Wis. 2d 307, 700 N.W.2d 180, like *BBB Doe,* involved claims brought against priests and the Archdiocese by adults who alleged they were sexually abused as children by priests. Specifically, the plaintiffs alleged that the Archdiocese negligently supervised the priests.

¶ 108. The majority opinion in *John Doe 67C,* however, did not answer whether a claim of negligent

supervision was a derivative claim and did not answer whether a claim of negligent supervision could be saved by the discovery rule. The majority opinion in *John Doe 67C* upholds dismissal of the plaintiffs' negligent supervision claims on very limited grounds: the complaint insufficiently alleged facts to support the claim of negligent supervision. The *John Doe 67C* court makes clear that it was leaving resolution of the questions regarding negligent supervision for another day.[18]

¶ 109. If there were any doubt about the majority's position in *John Doe 67C*, Justice Bradley's concurring opinion in *John Doe 67C* emphasized that "[i]nstead of answering the questions . . . the majority dodges them. It decides this case in an error correcting fashion based on the sufficiency of particular allegations in an individual complaint." *John Doe 67C*, 284 Wis. 2d 307, ¶ 62 (Bradley, J., concurring). Justice Bradley announced that "the questions in this context remain open." *Id.*, ¶ 63 (Bradley, J., concurring).

¶ 110. If compelled to find support in a case involving similar parties, the majority opinion should more closely examine *L.L.N. v. Clauder*, 209 Wis. 2d 674, 563 N.W.2d 434 (1997). In *Clauder*, the court was faced with a situation similar to *Pritzlaff*. The plaintiff,

_____

[18] The *John Doe 67C* court explained that "[i]n essence, Doe alleges that the Archdiocese committed the tort of negligent supervision because it 'knew or should have known' that its employee, Nuedling, was in fact a notorious pedophile." 284 Wis. 2d 307, ¶ 21. Footnote three in this paragraph explains:

This court did not recognize the tort of 'negligent supervision' until 1998. *Miller v. Wal-Mart Stores, Inc.*, 219 Wis. 2d 250, 267–68, 580 N.W.2d 233 (1998). Doe argues that because he did not discover his claims until 2002, four years after our decision in Miller, he can benefit from that holding despite the fact that the Archdiocese's allegedly wrongful conduct occurred in 1960–62. Given our holding in this case, we need not address this argument.

an adult woman, alleged that the diocese was negligent in supervising the priest who served as a hospital chaplain and who used his position as a pastoral counselor to coerce the woman to have sexual relations.

¶ 111. The *Clauder* court, like the *Pritzlaff* and *BBB Doe* courts, refused to recognize whether the claim of negligent supervision existed in Wisconsin law. Nonetheless, the *Clauder* court elaborated on what it thought this claim might look like, reaching conclusions similar to those in the *Miller* and *Doyle* cases, which recognized the claim.

¶ 112. The *Clauder* court stated that in negligent supervision, "liability does not result solely because of the relationship of the employer and employee, but instead because of the independent negligence of the employer." 209 Wis. 2d at 699 (citing Restatement (Second) of Agency § 213 cmt. d). According to the *Clauder* court,

> a claim for negligent supervision is distinct from a claim for vicarious liability, in that the former is based on tort principles and the latter is based on agency principles. More specifically, with a vicarious liability claim, an employer is alleged to be vicariously liable for a negligent act or omission committed by its employee in the scope of employment. Thus, vicarious liability is based solely on the agency relationship of a master and servant. In contrast, with a negligent supervision claim, an employer is alleged to be liable for a negligent act or omission it has committed in supervising its employee. Therefore, liability does not result solely because of the relationship of the employer and employee, but instead because of the independent negligence of the employer.

209 Wis. 2d at 699 n.21.

¶ 113. The *Clauder* court elaborated further: "Liability results under the rule stated in this Section [of the Restatement (Second) of Agency] not because of the relation of the parties, but because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment. The employer is subject to liability only for such harm as is within the risk." *Clauder*, 209 Wis. 2d at 699.

¶ 114. *Clauder*, too, is not controlling precedent. Like *BBB Doe* and *Pritzlaff*, it does not recognize the claim of negligent supervision and only ruminates about what it might look like. Nonetheless, *Clauder* engages in a richer discussion beyond the few sentences located in *Pritzlaff* and *BBB Doe*.

¶ 115. Justice Bradley's concurring opinion in *John Doe 67C* explained the direct claims against the Archdiocese and the application of the statute of limitations and the discovery rule: "Because Doe's independent, direct claims against the Archdiocese involve different elements from any potential cause of action against [the priest], the discovery rule may still benefit Doe's claims even when the underlying claim against the perpetrator has already been time barred. As counsel for Doe explained at oral argument, the allegations in this case 'do not arise out of the moment of the sexual attack. They arise out of the secrecy of the Archdiocese, which we could only learn about as of 2002.'" 284 Wis. 2d 307, ¶ 83 (Bradley, J., concurring).

¶ 116. Justice Bradley's reasoning in *John Doe 67C* applies in the instant case.

\* \* \* \*

¶ 117. Decades have elapsed since the alleged wrongful conduct of the Archdiocese occurred. But that should not prevent the plaintiffs from having their day

in court. The plaintiffs shoulder the burden of proving their case against the Archdiocese, including demonstrating that the discovery rule applies to their independent causes of action against the Archdiocese. I would give them that opportunity rather than dismissing their complaint and terminating their cause.

¶ 118. For the foregoing reasons, I concur in the parts of the majority opinion that reverse the decision regarding the plaintiffs' causes of action grounded in fraud and I dissent from the parts of the majority opinion that affirm the decision dismissing the negligent supervision claims. I would remand the cause to the circuit court for further proceedings on all of the plaintiffs' claims.

¶ 119. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.