In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-2870

SARAH JOHNSON,

*Plaintiff-Appellant,*

*v.*

NORTHEAST SCHOOL CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:18-cv-68 — **James R. Sweeney, II**, *Judge.*

SUBMITTED MAY 20, 2020[*] — DECIDED AUGUST 26, 2020

Before SYKES, *Chief Judge*, and RIPPLE and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge*. Sarah Johnson sued North Central High School and Northeast School Corporation ("NESC") in

---

[*] We agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. Fed. R. App. P. 34(a)(2)(C).

2018, claiming that their inadequate response to her allegations of sexual harassment violated Title IX, 20 U.S.C. § 1681(a). The district court entered summary judgment for North Central[1] and NESC on all claims. Johnson now takes issue with two of the district court's evidentiary determinations and its disposition of her Title IX claim. Because Johnson has waived any arguments regarding the district court's evidentiary rulings and because NESC was not deliberately indifferent to Johnson's claims of sexual harassment, we affirm.

## I. BACKGROUND

On November 5, 2015, Johnson—a student at North Central—told her grandmother, Leslie Hawker, that she had been raped in 2014 at an apartment complex by two classmates, Garrett Froschauer and Romeo Risley. Hawker, after hearing Johnson's allegation, went to North Central, informed Principal Monty Kirk about the off-campus rape, and said that she would report this allegation to the police.

This wasn't the first time that Principal Kirk was made aware of a rape allegation against Froschauer. Harley Gilliam, one of Johnson's friends, alleged that Froschauer raped her in her bedroom the year before. Gilliam's mother reported this incident to Principal Kirk just a few months before Hawker reported Johnson's incident. But Gilliam's mother did not allow school officials to interview Gilliam, so the school waited to hear the results of the investigations being conducted by the Department of Child Services ("DCS") and the sheriff's department. Although Principal Kirk did not receive or seek

---

[1] Johnson failed to respond to North Central's argument that it is not a legal entity with the capacity to be sued. The district court therefore held that "NCHS is entitled to dismissal from this action." [Doc. 67 p. 10.]

DCS's official report, he remembers someone from DCS informing him that Gilliam's claim was determined to be unsubstantiated. The official DCS report, however, concluded that "[s]exual abuse is recommended to be substantiated" against Froschauer as to Gilliam.

Principal Kirk responded to Gilliam's allegation by issuing a no-contact order between Gilliam and Froschauer, which prevented them from touching or speaking to each other at school. Gilliam withdrew from North Central a month later but did not report that she had been bullied or harassed by Froschauer during this time.

Shortly after Gilliam's withdrawal, Principal Kirk began responding to Hawker's report that Johnson—like Gilliam—had been raped off-campus by Froschauer. The same night Hawker came to Principal Kirk with this allegation, Principal Kirk told Superintendent Mark Baker, and they began consulting with the school's attorneys about how to handle the situation. Also that same night, Hawker and Johnson went to the sheriff's department and reported the rape. The sheriff's department assigned Deputy Carl Melchert to handle the matter.

Hawker spoke with Principal Kirk again the next morning. She informed Kirk that the police were having Johnson interviewed by a trained professional at a child advocacy center, Susie's Place, and she did not want Johnson interviewed by North Central officials. Hawker also wanted Froschauer immediately removed from school. Principal Kirk told her that an investigation needed to occur before any disciplinary decisions were made. He then confirmed with Deputy Melchert that the sheriff's department was aware of Johnson's

allegation and that Johnson would be interviewed at Susie's Place.

That same day, Principal Kirk issued a no-contact order between Johnson and Froschauer. This order prevented Johnson and Froschauer from touching or speaking to each other at school and from using electronic communication to talk about each other. The order did not, however, prevent Johnson and Froschauer from sitting near each other in class. Johnson and Froschauer were aware that the order prevented them from talking to one another.

Johnson and Froschauer had morning classes together, so Principal Kirk considered moving Froschauer out of these classes and placing him in homebound schooling. But based on Froschauer's schedule, he could not be moved out of these classes without it affecting his ability to graduate on time. The school's lawyers advised Principal Kirk not to "negatively impact [Froschauer's] track to graduate on time based on unsubstantiated allegations." And Johnson's physician and Hawker had requested that Johnson be placed in homebound schooling. So, a few weeks after Johnson reported her rape to the school, Principal Kirk placed Johnson in homebound schooling so that she could avoid her morning classes with Froschauer. She still went to school in the afternoons.

Meanwhile, Deputy Melchert continued his investigation. Principal Kirk contacted Deputy Melchert over a dozen times seeking details about the investigation. Deputy Melchert told Principal Kirk only that "the complaining student was going to give a forensic interview." After Johnson's interview, the prosecutor decided not to file criminal charges against Froschauer. Principal Kirk noted that, around this time, "all communication stop[ped]" with Deputy Melchert.

A few months later, Principal Kirk learned that the prosecutor decided not to criminally charge Froschauer. He also learned that the sheriff's department would not release details of the investigation to the school. Principal Kirk reached out to Hawker and again asked if the school could interview Johnson for a Title IX investigation; Hawker again refused this request. Principal Kirk also reached out to Froschauer, but he declined to be interviewed.

Around the same time, Johnson and Hawker informed Principal Kirk that Johnson was being harassed at school. Hawker first emailed Principal Kirk in January, informing him that a girl at school "had told 'others' that she was going to 'kick [Johnson's] ass.'" As a result of this threat, Johnson did not want to go to the cafeteria for lunch. Principal Kirk made sure that Johnson could eat lunch "in the office" or "otherwise sit in the office if she wanted a break from class." He spoke with the girl who made the threat and told her to not have any communication with Johnson that could be perceived as negative.

The next month, Hawker emailed Principal Kirk because one of Johnson's fellow cheerleaders sent an unkind tweet about Johnson. Hawker wanted immediate action taken against the girl; Principal Kirk informed Hawker that he was discussing the issue with the school's attorneys and he would be following their instructions. Principal Kirk met with the girl who sent the tweet and told her to "knock it off."

Later that afternoon, Hawker called Principal Kirk to tell him that Johnson was harassed and chased down the hallway by students—including Froschauer—after she opened a door for them. Johnson's story was slightly different: while she thought other students laughed at her and chased her down

the hallway, she did not identify Froschauer as one of those students. Principal Kirk reviewed video of this incident and concluded that Hawker's and Johnson's allegations did not reflect what occurred.

A few weeks later, Hawker and Johnson obtained a protective order against Froschauer that prevented him from being at school with Johnson. So Principal Kirk sent Froschauer home. The judge soon amended the protective order to allow Froschauer back in school, but Froschauer was still prevented from incidentally contacting Johnson. A police officer informed Hawker of this change and told her that if Froschauer "so much as looked at [Johnson]," Hawker could have Froschauer arrested.

Shortly after Froschauer was allowed back in school, Hawker and Johnson complained to Principal Kirk and the sheriff's department that Froschauer intentionally crossed paths with Johnson in the hallway, in violation of the protective order. Deputy David Holmes responded and met with Hawker and Principal Kirk. Principal Kirk allowed Deputy Holmes to review video of the incident. Deputy Holmes concluded that "[Froschauer] passed by [Johnson] in a manner that was more consistent with someone trying to avoid her as opposed to someone attempting to be close to her or otherwise intimidate her." Froschauer was not arrested by Deputy Holmes or disciplined by Principal Kirk.

Johnson and Hawker also alleged that Froschauer harassed them at a North Central basketball game. Hawker alleged that Froschauer sat directly behind them at the game. Johnson remembered Froschauer sitting behind them, but he was a few risers above them. Principal Kirk was at this game and paid "special attention to ensure [Froschauer] did not

interact with [Johnson]." Principal Kirk stated that Froschauer did not sit directly behind Johnson, but instead sat "about 4 rows behind [Johnson] and off to the side."

Johnson eventually withdrew from North Central. Hawker filed a complaint with the United States Department of Education Office for Civil Rights ("OCR"). Johnson sued NESC and North Central. She alleged NESC and North Central subjected her to discrimination on the basis of sex in violation of Title IX, 20 U.S.C. § 1681(a). She also claimed they violated state law by failing to have an anti-bullying policy. The defendants moved for summary judgment on all claims and objected to some evidence that Johnson relied on. Johnson cited a declaration from the Executive Director of the non-profit organization Stop Sexual Assault in Schools, Dr. Esther Warkov, who stated that she had knowledge of North Central's failure to enforce Title IX in this case. Johnson also cited the OCR's report detailing the findings of its Title IX investigation.

The district court excluded the declaration of Dr. Warkov and the OCR report and granted summary judgment to the defendants on all claims. Johnson appeals the district court's decisions.

## II. ANALYSIS

Johnson raises three issues on appeal. First, Johnson objects to the district court's decision to exclude Dr. Warkov's declaration. Second, she objects to the exclusion of the OCR report. Finally, she argues that NESC was not entitled to summary judgment on her Title IX claim.

*A. Evidentiary Rulings*

In its order granting summary judgment, the district court also excluded Dr. Warkov's declaration and the OCR report. The court excluded Dr. Warkov's declaration because she was not timely disclosed as an expert witness "as required by the Case Management Plan" and she was not disclosed on Johnson's final witness list. The court excluded the OCR report because it was not properly authenticated. Johnson now claims that the district court erred by striking Dr. Warkov's declaration and that the "court did not consider the impact of the Settlement Agreement in its ruling regarding the OCR Report."

But to present an argument on appeal, "a party must develop its position by providing citation to … supporting authority." *Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009). Here, Johnson does not identify a standard of review or the legal standards applicable to the district court's decisions to exclude Dr. Warkov's declaration and the OCR report. In fact, Johnson does not cite a single legal authority supporting her claims about this evidence. "It is not our job to do the legal research that [Johnson] has omitted." *Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 581 (7th Cir. 2005).

Any arguments that Johnson attempts to make about Dr. Warkov's declaration and the OCR report are undeveloped and unsupported; these arguments are waived. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016).

*B. Title IX Claim*

The district court granted summary judgment to NESC on Johnson's Title IX claim. We review a district court's grant of summary judgment *de novo*, viewing the facts in a light most favorable to the non-moving party, in this case Johnson. *See Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). And under Title IX, a school may be held liable for the sexual harassment of one of its students "when the harasser is a student." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999).

But the Supreme Court has set a "high bar for plaintiffs seeking to hold schools and school officials liable for student-on-student harassment." *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014). To prove a Title IX sexual-harassment claim between students, a plaintiff must demonstrate that the school was "deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650.

Johnson argues that the district court erred by granting summary judgment to NESC on her Title IX claim. Specifically, she contends that the district court "drew inferences more favorably to NESC than to her" in determining that summary judgment was appropriate. She argues that the entire course of events—starting with the sexual assault of Gilliam—constitutes severe, pervasive, and objectively offensive harassment, of which NESC had actual knowledge. Johnson finally argues that NESC was deliberately indifferent to Gilliam's rape allegation, Johnson's rape allegation, and the additional alleged harassment that Johnson suffered while at school.

We agree that NESC had knowledge of Johnson's alleged harassment. We are skeptical, however, that the conduct Johnson describes occurring at North Central rises to the level of severe, pervasive, and objectively offensive sexual harassment. But we need not resolve these issues because, assuming the entire course of conduct in this case amounts to severe sexual harassment, NESC was not deliberately indifferent to this harassment.

Title IX requires Johnson to prove that the school was deliberately indifferent to known acts of harassment. *See Davis*, 526 U.S. at 633. To ensure that school administrators "continue to enjoy the flexibility they require" in making disciplinary decisions, the school will not be held liable unless its response to harassment is "clearly unreasonable in light of the known circumstances." *Id.* at 648. A negligent response is not unreasonable, and therefore will not subject a school to liability. *See Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1105 (9th Cir. 2020). And we will not second guess a school's disciplinary decisions—even a school's decision not to impose any

disciplinary measures—so long as those decisions are not clearly unreasonable. *See id.* at 1109; *Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 849 (6th Cir. 2016). Indeed, judges "make poor vice principals." *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 996 (5th Cir. 2014). And in appropriate cases, courts can "identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

Johnson first takes issue with NESC's response to Gilliam's rape allegation. Johnson argues that if NESC would have conducted a proper investigation, it would have expelled Froschauer, and therefore Johnson would not have been subjected to some of the alleged harassment she faced at school.

NESC's response to Gilliam's allegation was not clearly unreasonable. Gilliam's mother reported to Principal Kirk that Gilliam's "incident with [Froschauer] was not consensual and that they had reported the matter to law enforcement." Gilliam's mother did not want Gilliam interviewed by school officials and instead had her interviewed by professionals at Susie's Place. Principal Kirk never received a report about Gilliam's allegation from DCS, and he did not receive information relating to the criminal investigation. Principal Kirk issued a no-contact order between Froschauer and Gilliam and continued to monitor the situation. Gilliam and her mother did not report that Froschauer harassed Gilliam during school or at school-related events.

This is not a situation where the school "learned of a problem and did nothing." *Rost ex rel. K.C. v. Steamboat Springs RE–2 Sch. Dist.*, 511 F.3d 1114, 1122 (10th Cir. 2008). Instead, it was reasonable for Principal Kirk to defer to law enforcement and DCS where the sexual assault occurred off-campus and

criminal charges were a possibility. *Id.* at 1121. Still, Principal Kirk did not stand by and do nothing: he issued a no-contact order preventing Froschauer from speaking to Gilliam at school. And after the no-contact order was in place, Gilliam was not harassed by Froschauer.

Johnson faults NESC here for not conducting a more thorough investigation of Gilliam's allegation. Johnson believes Principal Kirk was required to reach out to DCS and obtain a copy of its report rather than rely on the alleged DCS employee who verbally informed Principal Kirk that Gilliam's claim was unsubstantiated. It's true that Principal Kirk could have done more to investigate Gilliam's specific claims. As Johnson suggests, he could have reached out to DCS employees to get a copy of the report and confirm the results of the investigation. But blaming NESC for failing to take the specific actions that Johnson would have preferred it to take "sounds in negligence, not deliberate misconduct." *Id.* at 1126. And in light of the circumstances known to Principal Kirk at that time, including being told by someone he believed to be a DCS employee that Gilliam's claims were unsubstantiated, it was not clearly unreasonable for him not to follow up with DCS.

Johnson also suggests that NESC's course of action was not enough and insists that Froschauer should have been immediately expelled. But school administrators are not required to expel every student accused of sexually harassing another student to avoid Title IX liability. *See Davis*, 526 U.S. at 648. In fact, schools are not required to engage in any specific forms of discipline, and we will defer to the school's decisions so long as the school's response is not clearly unreasonable. *Galster*, 768 F.3d at 619. And it was not clearly

unreasonable for NESC to decline to expel Froschauer after Gilliam's individual, uncorroborated allegation. NESC's overall response to Gilliam's allegation of off-campus sexual harassment was therefore not clearly unreasonable.[2]

Johnson next takes issue with the way NESC responded to her own rape allegation. She argues that NESC refused to investigate and "deliberately decided not to interview or change Froschauer's schedule." This, she argues, shows that NESC was deliberately indifferent to sexual harassment.

But undisputed facts in the record show that school officials did not refuse to conduct an investigation. Principal Kirk attempted to interview Froschauer, but *Froschauer* refused. And Principal Kirk, on multiple occasions, attempted to interview Johnson. But *Hawker* denied his requests. Johnson cannot now claim that NESC conducted a lackluster investigation that amounts to deliberate indifference when it was others who stifled its attempt to conduct one. *See Rost*, 511 F.3d at 1122.

And the remainder of Principal Kirk's response to Johnson's initial sexual harassment claim is not clearly unreasonable either. As soon as Principal Kirk learned of Johnson's claim that she had been raped by Froschauer, he confirmed with law enforcement that an investigation was taking place. He also remained in contact with the investigating officer and attempted to procure details of the investigation. But the prosecutor declined to charge Froschauer and also did not allow Deputy Melchert to share details of the investigation with

---

[2] Because NESC's response to Gilliam's rape allegation was not clearly unreasonable, we need not delve further into whether this allegation and NESC's response would provide support for *Johnson's* Title IX claim.

Principal Kirk. And with Hawker refusing Principal Kirk's requests to interview Johnson, he was left without any way to substantiate Johnson's allegations, making it difficult to discipline Froschauer.

Principal Kirk then entered a no-contact order between Froschauer and Johnson, and he considered changing Froschauer's schedule. But changing Froschauer's schedule would have delayed his graduation. The school's lawyers advised Principal Kirk not to "negatively impact [Froschauer's] track to graduate on time based on unsubstantiated allegations." *Cf. Galster*, 768 F.3d at 621 ("School-age bullies also have legal rights."). And Johnson's physician and Hawker both asked that Johnson start homebound schooling. Because Principal Kirk agreed to place Johnson in homebound schooling, he did not ultimately have to decide if Froschauer's schedule should be changed. *Cf. Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 825 (7th Cir. 2003) (a school's decision to grant a student's request to transfer schools was not clearly unreasonable). Johnson, after requesting that she be placed in homebound schooling before the school had an opportunity to investigate her claim, should not now be able to claim that NESC "privileged" Froschauer by not changing his schedule.

In response to Johnson's rape allegation, Principal Kirk immediately issued a no-contact order, stayed in contact with law enforcement concerning a pending investigation, attempted to conduct his own investigation, and made difficult decisions about how to approach a complicated situation that involved the rights of both Johnson and Froschauer. *See Galster*, 768 F.3d at 621 ("Federal law gives school officials wide discretion in making disciplinary decisions, especially

as they have to balance the interests of all concerned."). It's true that, even with the measures put in place by Principal Kirk, Johnson still had to see Froschauer in the halls of North Central. We do not take lightly the fact that it may have been difficult, even traumatic, for Johnson to have to face her alleged rapist every day at school. But under these circumstances, we do not think Principal Kirk was required to take any specific form of disciplinary action—like expulsion— against Froschauer. And based on the circumstances NESC was aware of at the time, its course of conduct in response to Johnson's rape allegation was not clearly unreasonable.

Finally, NESC's response to harassment directed towards Johnson at school in 2015 was also not clearly unreasonable. Johnson first informed the school that another student threatened to "kick [her] ass." Principal Kirk communicated with Johnson and Hawker and gave Johnson the option to eat lunch in the office or "otherwise sit in the office if she wanted a break from class." Even though that student denied making the threat, Principal Kirk told her that she could not have any communication with Johnson that could be perceived as negative.

Johnson and Hawker also reported to Principal Kirk that a student sent an unkind tweet about Johnson. Principal Kirk met with Johnson and Hawker about the tweet and informed them that Superintendent Baker was discussing the issue with the school's lawyers. Principal Kirk asked Johnson if anyone else was harassing her and reminded her "if something happens, to report it immediately." Principal Kirk sent the tweet to law enforcement and communicated to Hawker that this action had been taken.

As to the next allegation, Hawker reported to Principal Kirk that Johnson had been chased by Froschauer and other students. Principal Kirk reviewed video of this incident and determined that the allegation did not match what actually occurred. He observed that Johnson was walking at a normal pace the entire time and no students were chasing or following her. Principal Kirk therefore concluded that "[Johnson] was not harassed in the hallway by [Froschauer] or anyone else." As a result, Principal Kirk did not take disciplinary action against Froschauer or any other student.

Hawker and Johnson also informed Principal Kirk and the sheriff's department that Froschauer violated a protective order by walking up to Johnson, smirking at her, and brushing past her. Principal Kirk allowed the responding officer to review video footage of the alleged incident. But the officer determined that "[Froschauer] passed by [Johnson] in a manner that was more consistent with someone trying to avoid her as opposed to someone attempting to be close to her or otherwise intimidate her." So the officer did not arrest Froschauer for violating the protective order, and Principal Kirk did not discipline him.

Hawker's final complaint to Principal Kirk concerned alleged harassment at a basketball game. Hawker stated that Froschauer sat directly behind Johnson at this game. But Principal Kirk remembered it differently: he noticed Froschauer at the game, but he was "4 rows behind [Johnson] and off to the side." And Principal Kirk noted that, because he saw Froschauer at the game, he was paying close attention to make sure that Froschauer did not interact with Johnson. Hawker complained to Principal Kirk that Froschauer was allowed to be at the game. But at that time, she did not mention that

Froschauer made comments at Johnson, or otherwise both-
ered her. Principal Kirk did not discipline Froschauer based
on this incident.

Principal Kirk investigated each of these reported inci-
dents of harassment by: speaking to Hawker, Johnson, and
the other students involved; reviewing video footage when
necessary; involving the police department when necessary;
and relying on what he personally witnessed. *See Doe v. Co-
lumbia Coll. Chi.*, 933 F.3d 849, 857 (7th Cir. 2019); *Stiles*, 819
F.3d at 849 (school was not deliberately indifferent when it
promptly investigated individual claims of harassment). Prin-
cipal Kirk verbally warned students to leave Johnson alone
when he felt it was required. He also determined at times,
based on his investigation, that discipline was not necessary.
Based on Principal Kirk's willingness to communicate with
Johnson and Hawker, to investigate all claims of harassment,
and to communicate with the school's lawyers and the police
department, we cannot say that his responses to Johnson's
claims of harassment were unreasonable. So, we will not sec-
ond guess his disciplinary decisions.

In sum, NESC responded to Johnson's claims of harass-
ment immediately after Hawker informed Principal Kirk that
Johnson had been raped off-campus. Its overall response in-
cluded complying with and attempting to get information
from a police investigation, attempting to conduct its own Ti-
tle IX investigation, issuing a no-contact order, and respond-
ing to individual claims of harassment each time Johnson or
Hawker reported them to Principal Kirk. This response is not
clearly unreasonable, and therefore NESC was not deliber-
ately indifferent to Johnson's alleged sexual harassment.

The district court's judgment is thus AFFIRMED.