COURT OF APPEALS
DECISION
DATED AND FILED

November 29, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2021AP896**

**STATE OF WISCONSIN**

Cir. Ct. No. 2020CV880

**IN COURT OF APPEALS
DISTRICT III**

MICHELLE JAUQUET, INDIVIDUALLY
AND AS LEGAL GUARDIAN OF I. R., A MINOR CHILD,

   PLAINTIFF-APPELLANT,

 V.

GREEN BAY AREA CATHOLIC EDUCATION, INC.,

   DEFENDANT-RESPONDENT.

        APPEAL from an order of the circuit court for Brown County: DONALD R. ZUIDMULDER, Judge. *Affirmed*.

        Before Stark, P.J., Hruz and Gill, JJ.

        **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Michelle Jauquet, as legal guardian of Alex,[1] appeals from a circuit court order granting Green Bay Area Catholic Education, Inc.'s (GRACE) motion to dismiss her amended complaint for failure to state a claim upon which relief can be granted pursuant to WIS. STAT. § 802.06(2)(a)6. (2019-20).[2]  Jauquet sued GRACE alleging claims for common law negligence, negligent infliction of emotional distress, and breach of contract based on GRACE's handling of bullying behavior that Alex experienced while attending one of GRACE's schools.  Following Jauquet's submission of an amended complaint, GRACE filed a motion to dismiss for failure to state a claim, arguing that Jauquet alleged that GRACE had engaged in educational malpractice, a type of claim not recognized in Wisconsin; that Jauquet failed to allege sufficient facts in her amended complaint for each element of her alleged claims; and that Jauquet's negligence claims are barred by public policy.  The court granted GRACE's motion.

¶2     We affirm the circuit court's order granting GRACE's motion to dismiss Jauquet's amended complaint for failure to state a claim upon which relief can be granted.  We assume without deciding that Jauquet does not allege educational malpractice claims against GRACE.  Instead, we conclude that Jauquet failed to allege sufficient facts to state claims for common law negligence, negligent infliction of emotional distress, and breach of contract.  Lastly, we conclude that Jauquet's negligence claims are barred by public policy.

---

[1] We use pseudonyms throughout this opinion for any minors involved.

[2] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

2

**BACKGROUND**

¶3     The following facts are taken from Jauquet's amended complaint. GRACE operates a private Catholic school system in the Green Bay area consisting of nine primary and secondary schools. Alex attended Notre Dame in De Pere, one of the schools operated by GRACE, from fourth grade through eighth grade.

¶4     In the fall of 2019 during Alex's eighth grade year, a group of male students at Notre Dame, including a student named Thomas, began bullying Alex. Specifically, during a two-night school sponsored field trip in September, Thomas and other male students repeatedly called Alex a "slut" and a "skinny bitch." In December of that same year, Thomas spread "sexually suggestive and vulgar posts" on social media. While the social media posts were not specifically targeted toward Alex, she saw them. Some timelater, Thomas texted a picture of his penis to someone "as part of a solicitation to engage in sexual acts." Although the picture was not targeted toward any specific individual, it was widely shared with students in Alex's class. As with Thomas's social media posts, Alex saw the picture.

¶5     In response, Jauquet contacted Notre Dame's principal, Molly Mares, regarding the social media posts and picture. Mares met with Jauquet on December 11, 2019. Mares told Jauquet that she was aware of the social media posts, agreed that the contents were unacceptable, and promised to contact Thomas's parents "to take further action." Mares, however, did not contact Thomas's parents "or take any other responsive or protective actions" at that time.

¶6 Thomas's troubling behavior continued, and on December 14, 2019, he created a Snapchat conversation with other students titled "squeeze my wang."[3] In that conversation, participants made "body shaming" comments about Alex. For example, one comment stated, "[I]f you weren't 50 pounds you would be hot." Around that same time, Thomas posted an "inappropriate sexual and derogatory video." The next day, Jauquet had another meeting with Mares to discuss the video. Jauquet also requested that the school impose "discipline on the offending male students involved by suspending them."

¶7 On December 16, 2019,[4] Thomas "proposed to [Alex's] male classmates" that they purchase a rope for Alex and "'teach her to use it,' referring to the use of a noose to hang oneself." That same day, Jauquet again met with Mares. At that meeting, Jauquet requested that law enforcement be called, but Mares "promised only to contact a liaison officer." Mares subsequently held a meeting attended by Thomas, Thomas's parents, Alex, and Jauquet. Before the meeting, Mares "was observed coaching Thomas in how to issue a rote apology." Thomas later admitted the apology was "performative only." After the meeting, Thomas was suspended from school for three days. According to the amended complaint, the suspension allowed "him an early start to his Christmas vacation

---

[3] Snapchat is a mobile social media platform where a user can send disappearing messages, pictures, and videos to other users. *See* Tiffany Peón, *A Guide to Snapchat for People Who Don't Get Snapchat*, NEW YORK TIMES, (Feb. 7, 2018), https://www.nytimes.com/2018/02/07/smarter-living/snapchat-guide.html.

[4] Jauquet's amended complaint alleges that various events occurred in December 2020. Jauquet makes the same allegation in her briefs on appeal. Later in the amended complaint, however, she refers to events that allegedly occurred in December 2019. Based on the fact that a federal case was filed in April 2020, and based on the earlier referenced 2019 dates, we will assume that Jauquet meant to refer to December 2019 and not December 2020. *See **Jauquet v. Green Bay Area Cath. Educ., Inc.**, No. 20-C-647, 2020 WL 5016817 (E.D. Wis. Aug. 25, 2020).

and ensur[ed] that he would be done with [the] suspension in time to continue playing prominently on Notre Dame's basketball team immediately following Christmas [b]reak."

¶8    On December 17, 2019, Jauquet met with GRACE's president, Kim Desotell, and a liaison officer. Jauquet gave Desotell "substantially the same information available to Mares." In response, Desotell "explicitly supported and defended" Mares's previous decisions and "indicated [the decisions] would not be changed or overruled." According to the amended complaint, Desotell then verbally attacked Jauquet "for calling attention to the tolerance of bullying and sexual harassment culture at Notre Dame." Regarding Thomas's actions, Desotell "claimed that GRACE was unable to act concerning many of the sexual harassment and bullying elements." Further, the liaison officer "claimed not to have jurisdiction" to take legal action. Sometime after the meeting, Jauquet called the police, who came to her house and took statements regarding Thomas's behavior.

¶9    Following the Christmas break, a male student, who was a friend of Thomas, was suspended for threatening Alex while possibly referencing a gun. "[N]umerous" students blamed Alex for the student's suspension and "verbally or socially retaliated against her." In response, GRACE did not take any action to

5

protect Alex from the other students' blame. Desotell later told Jauquet that the student's suspension did not relate to Alex.[5]

¶10    Following the events described above, Jauquet filed suit against GRACE in federal district court. *See Jauquet v. Green Bay Area Cath. Educ., Inc.*, No. 20-C-647, 2020 WL 5016817 (E.D. Wis. Aug. 25, 2020). In that case, Jauquet alleged a claim for violation of Title IX of the Education Amendments of 1972, as well as claims of breach of contract and negligence under Wisconsin law. *Id.* at *1. The Title IX claim was dismissed with prejudice for failure to state a claim. *Id.* at *6. The court declined to exercise its supplemental jurisdiction over the state law claims and dismissed them without prejudice. *Id.* The Seventh Circuit affirmed the district court's dismissals. *Jauquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 812 (7th Cir. 2021).

¶11    After Jauquet's claims were dismissed by the district court, she filed this case against GRACE in state court, alleging claims for breach of contract and negligence. In response, GRACE filed a motion to dismiss pursuant to WIS. STAT. § 802.06(2)(a)6., arguing, among other things not relevant to this appeal, that Jauquet failed to state claims upon which relief could be granted because the claims Jauquet alleged against GRACE were educational malpractice claims that are not recognized under Wisconsin law.

---

[5] Jauquet also alleged other incidents of Thomas's bullying behavior that "Mares had actual notice of." First, roughly two years earlier, Thomas had "practiced pervasive sexual bullying against a boy using anti-LGBT slurs." A written safety plan was put in place "to help protect the male victim from assault." In other incidents, Thomas called female students at Notre Dame "sluts" and referred to a female student suffering from cancer as the "Hunchback of Notre Dame." Jauquet also alleged that Thomas repeatedly used social media with other students to share posts that included "vulgar sexual material, as well as numerous racial slurs and obscenity."

¶12     The circuit court ordered Jauquet to amend her complaint to more precisely define the scope and elements of her negligence and contract claims in order to succinctly assert causes of action recognized under Wisconsin law. Jauquet subsequently filed an amended complaint, alleging three claims: (1) breach of contract warranty; (2) common law negligence; and (3) negligent infliction of emotional distress. GRACE then filed another motion to dismiss, again arguing that Jauquet's claims were educational malpractice claims. GRACE also argued that Jauquet failed to allege sufficient facts to state any viable claims, and, further, to the extent that she alleged a viable negligence claim, it is precluded by public policy considerations.

¶13     Following a hearing, the circuit court dismissed the amended complaint with prejudice for failure to state actionable claims. The court held that Jauquet's negligence claims were actually educational malpractice claims and were thus barred by Wisconsin law. The court further held that Jauquet had failed to state either a tort-based or contract-based claim upon which relief could be granted. Jauquet now appeals.

## DISCUSSION

### I.  Standard of review and applicable law

¶14     GRACE argues on appeal that all of Jauquet's claims—not only her negligence claims, as the circuit court concluded—are actually claims for educational malpractice. We need not address that issue, however; instead we decide the matter on narrower grounds. We assume without deciding that Jauquet does not allege claims for educational malpractice, and we address her claim that the circuit court erred in dismissing her amended complaint for failure to state a claim upon which relief can be granted. *See State v. Castillo*, 213 Wis. 2d 488,

7

492, 570 N.W.2d 44 (1997) ("An appellate court should decide cases on the narrowest possible grounds.").

¶15 In reviewing an order granting a motion to dismiss for failure to state a claim, we apply the same standards as the circuit court, *Meyers v. Bayer AG*, 2006 WI App 102, ¶7, 293 Wis. 2d 770, 718 N.W.2d 251, and independently review whether a complaint fails to state a claim, *John Doe 1 v. Archdiocese of Milwaukee*, 2007 WI 95, ¶12, 303 Wis. 2d 34, 734 N.W.2d 827. Ultimately, we may affirm for reasons the court did not consider. *Anderson v. Regents of Univ. of Cal.*, 203 Wis. 2d 469, 480, 554 N.W.2d 509 (Ct. App. 1996).

¶16 "A motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint." *John Doe 1*, 303 Wis. 2d 34, ¶12 (citation omitted). "Dismissal of a claim is improper if there are any conditions under which [a plaintiff] could recover." *Id.* (citation omitted). As such, we liberally construe the pleadings and accept the facts in the amended complaint as true, "as well as all reasonable inferences from those facts." *See id.*; *see also Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶2 n.1, 283 Wis. 2d 555, 699 N.W.2d 205.

¶17 Still, we "cannot add facts in the process of liberally construing the complaint." *Doe v. Archdiocese of Milwaukee*, 2005 WI 123, ¶19, 284 Wis. 2d 307, 700 N.W.2d 180. Nor will we assume that legal conclusions pled by a plaintiff are true, and "bare conclusion[s] do[] not fulfill a plaintiff's duty of stating the elements of a claim in general terms." *Id.*, ¶¶19, 36. Lastly, "the sufficiency of a complaint depends on [the] substantive law that underlies the claim made because it is the substantive law that drives what facts must be pled."

*Data Key Partners v. Permira Advisers LLC*, 2014 WI 86, ¶31, 356 Wis. 2d 665, 849 N.W.2d 693.

¶18 Jauquet first addresses the scope of our standard of review. She contends that the circuit court erred in granting GRACE's motion to dismiss for failure to state a claim because there are conditions under which she can recover. Specifically, Jauquet argues that "because the standard of review tests merely whether it is possible that [she] could win, not that she has already proven her case beyond doubt," unlike a review of a summary judgment or trial verdict decision, we should not review the substantive law beyond her amended complaint. For example, Jauquet asserts that we should not consider GRACE's arguments regarding "the parameters or limits" of GRACE's alleged duty with regard to Jauquet's breach of contract claim. Jauquet's argument, however, ignores the well-settled standard of review applicable to dismissals for failure to state a claim.

¶19 While Jauquet is correct that we are not analyzing whether she has *proved* her claims, we are analyzing whether she has *alleged* facts sufficient to establish the elements of her claims. *See Hornback v. Archdiocese of Milwaukee*, 2008 WI 98, ¶16, 313 Wis. 2d 294, 752 N.W.2d 862. Therefore, we must look at the elements of each claim and consider whether each element could be met, given the facts alleged in the amended complaint and the underlying substantive law. *See id.*

¶20 WISCONSIN STAT. § 802.02(1) sets forth the requirements for a complaint to withstand a motion to dismiss for failure to state a claim. *Data Key Partners*, 356 Wis. 2d 665, ¶20. Section 802.02(1)(a) provides:

9

General rules of pleading.

(1) Contents of pleadings. A pleading or supplemental pleading that sets forth a claim for relief … shall contain all of the following:

(a) A short and plain statement of the claim, identifying the transaction or occurrence or series of transactions or occurrences out of which the claim arises and showing that the pleader is entitled to relief.

(Formatting altered.) In order to satisfy the rules of pleading, "a complaint must plead facts, which if true, would entitle the plaintiff to relief." ***Data Key Partners***, 356 Wis. 2d 665, ¶21. "Factual assertions are evidenced by statements that describe: 'who, what, where, when, why, and how.'" ***Id.***, ¶21 n.9 (citation omitted).

## II. Negligence claims

### A. Jauquet failed to allege sufficient facts to survive a motion to dismiss for failure to state a claim.

¶21 In order to state a claim for common law negligence in this case, Jauquet's amended complaint was required to allege that: "(1) [GRACE] had a duty of care; (2) [GRACE] breached that duty; (3) a causal connection exists between the conduct and the injury; and (4) damage resulted from the injury." *See McMahon v. St. Croix Falls Sch. Dist.*, 228 Wis. 2d 215, 222, 596 N.W.2d 875 (Ct. App. 1999). Similarly, for Jauquet to state a claim for direct negligent infliction of emotional distress[6] in this case, Jauquet was required to allege

---

[6] It is unclear if Jauquet is alleging bystander negligent infliction of emotional distress (i.e., that Jauquet, as Alex's legal guardian, suffered damages) or a direct claim of negligent infliction of emotional distress (i.e., Alex suffered damages), or both. *See Camp ex rel. Peterson v. Anderson*, 2006 WI App 170, ¶¶17-21, 295 Wis. 2d 714, 721 N.W.2d 146. We will therefore address both claims in our analysis.

that: (1) GRACE was negligent with respect to the alleged incidents; (2) the incidents caused Alex emotional distress; and (3) the emotional distress was severe. *See Camp ex rel. Peterson v. Anderson*, 2006 WI App 170, ¶18, 295 Wis. 2d 714, 721 N.W.2d 146; *see also* WIS JI—CIVIL 1511 (2018).

¶22 A duty of care is established "whenever it was foreseeable to the defendant that his or her act or omission to act might cause harm to some other person." *Hornback*, 313 Wis. 2d 294, ¶21 (quoting *Gritzner v. Michael R.*, 2000 WI 68, ¶20, 235 Wis. 2d 781, 611 N.W.2d 906). Whether there is a duty "may depend on the relationship between the parties or on whether the alleged tortfeasor assumed a special role in regard to the injured party." *Hoida, Inc. v. M & I Midstate Bank*, 2006 WI 69, ¶32, 291 Wis. 2d 283, 717 N.W.2d 17. But, "[a]t the very least, every person is subject to a duty to exercise ordinary care in all of his or her activities." *Gritzner*, 235 Wis. 2d 781, ¶20. Therefore, to allege a duty of care, Jauquet's amended complaint "was required to state general facts showing that [GRACE] should have foreseen that some injury was probable when it failed to [act in a certain way]." *See Sigler v. Kobinsky*, 2008 WI App 183, ¶10, 314 Wis. 2d 784, 762 N.W.2d 706.

¶23 Jauquet's amended complaint alleges that GRACE had "a duty to protect victims like Alex from both physical danger and emotional abuse." The amended complaint further alleges that GRACE breached that duty to protect victims through "inaction, indifference, and dishonesty," and as a result, Jauquet and Alex suffered significant emotional injury and distress, and Alex withdrew from extracurricular activities. Regarding Jauquet's negligent infliction of emotional distress claim, the amended complaint alleges that GRACE's negligence caused Alex "severe emotional distress … due to both the impact of the ongoing bullying and solicitations to suicide and the impact of GRACE's

valuation of the perpetrator's interests above … Alex's own welfare and survival as a victim."

¶24 Taken as a whole, Jauquet's negligence claims are premised on GRACE's alleged failure to act in a specific way, i.e., one that is in accordance with Jauquet's perspective on how bullying should be handled. Specifically, Jauquet contends that GRACE should have suspended Thomas before it did so in December 2019. Yet, nowhere in Jauquet's one-sentence allegation regarding GRACE's duty does she allege the basis for that claim, or that GRACE should have foreseen that an injury to Alex was probable due to the failure to suspend Thomas earlier. "The mere possibility of harm is insufficient to establish negligence." *Id.*

¶25 Even if Jauquet alleged facts sufficient to demonstrate that GRACE owed a duty to act in a certain way regarding Thomas's bullying, Jauquet failed to allege facts showing that GRACE breached that duty. Jauquet alleged in her amended complaint that GRACE breached its duty through "inaction, indifference, and dishonesty." But again, Jauquet did not allege facts stating *how* GRACE breached its alleged duty to act in a certain way in response to Jauquet's bullying allegations. Instead, Jauquet's amended complaint states all of the actions GRACE did take, including: (1) holding a meeting between Thomas, Thomas's parents, Alex, and Jauquet; (2) suspending Thomas for three days; and (3) suspending another student following Christmas break. Therefore, Jauquet failed to allege sufficient facts to state a negligence claim or a claim for direct negligent infliction of emotional distress.

¶26 Similarly, to show bystander negligent infliction of emotional distress, Jauquet's amended complaint needed to allege that: (1) GRACE's

conduct fell below the applicable standard of care; (2) Jauquet suffered severe emotional distress; and (3) GRACE's conduct was a cause-in-fact of Jauquet's injury. *See Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 632, 517 N.W.2d 432 (1994); *see also* WIS JI—CIVIL 1510 (2014). In addition, there are also three prerequisites to a bystander negligent infliction of emotional distress claim:

> 1) the injury suffered by the victim must have been fatal or severe; 2) the claimant must be related to the victim as a spouse, parent, child, grandparent, grandchild, or sibling; and 3) the claimant must have witnessed the incident causing death or serious injury or "the gruesome aftermath of such an event minutes after it occurs."

*Finnegan ex rel. Skoglind v. Wisconsin Patients Comp. Fund*, 2003 WI 98, ¶19, 263 Wis. 2d 574, 666 N.W.2d 797 (citing *Bowen*, 183 Wis. 2d at 658); *see also* WIS JI—CIVIL 1510.

¶27 Here, Jauquet's amended complaint fails to sufficiently allege the bystander negligent infliction of emotional distress prerequisites. In *Bowen*, the mother of a fourteen-year-old arrived on scene minutes after a "serious accident" that left her son fatally injured and "entangled in the wreckage." *Bowen*, 183 Wis. 2d at 657-58. Our supreme court concluded that the mother had sufficiently witnessed the gruesome aftermath for purposes of satisfying the prerequisites for a bystander negligent infliction of emotional distress claim. *See id.* at 658.

¶28 As GRACE points out, Jauquet did not allege in her amended complaint that she witnessed "the incident causing death or serious injury or 'the gruesome aftermath of such an event minutes after it occur[ed].'" *See Finnegan*, 263 Wis. 2d 574, ¶19 (citation omitted). The closest Jauquet comes to alleging having witnessed any injury is her claim that "GRACE's indifference to the sexual

harassment and bullying has resulted in significant and ongoing emotional injury to both Alex and … Jauquet." As such, even construing the amended complaint's allegations in favor of Jauquet, there are no conditions under which she could recover for bystander negligent infliction of emotional distress.

B. Any potential liability is precluded by public policy.

¶29 GRACE additionally argues that Jauquet's claims were properly dismissed for failure to state a claim based on public policy.[7] We agree.

¶30 Even if Jauquet is "able to establish a duty of care and the other elements of a negligence claim, the [circuit] court may nonetheless determine that public policy considerations preclude liability." *See* **Gritzner**, 235 Wis. 2d 781, ¶25. In complex cases, it is typically better practice to allow a jury to determine whether the elements of negligence have been met. **Id.** "However, when the facts are not complex and the relevant public policy questions have been fully presented, [we] may determine whether public policy precludes liability before trial." **Id.** Such a determination can be made when reviewing a motion for failure to state an actionable claim. **Butler v. Advanced Drainage Sys., Inc.**, 2006 WI 102, ¶20, 294 Wis. 2d 397, 717 N.W.2d 760; **Hornback**, 313 Wis. 2d 294, ¶20.

¶31 Six public policy factors exist to determine if a court should "deny liability even in the face of proven or assumed negligence":

---

[7] We note that Jauquet failed to directly respond to GRACE's public policy arguments, including an analysis of the six public policy factors discussed herein, despite the fact that the issue was raised in GRACE's second motion to dismiss at the circuit court level and in GRACE's brief on appeal. As a result, we could deem Jauquet to have admitted the public policy argument in favor of GRACE. *See* **Schlieper v. DNR**, 188 Wis. 2d 318, 322, 525 N.W.2d 99 (Ct. App. 1994). That said, because we decide in favor of GRACE, we will analyze the public policy issue.

(1) "the injury is too remote from the negligence"; (2) the recovery is "wholly out of proportion to the culpability of the negligent tort-feasor"; (3) the harm caused is highly extraordinary given the negligent act; (4) recovery "would place too unreasonable a burden" on the negligent tort-feasor; (5) recovery would be "too likely to open the way to fraudulent claims"; and (6) recovery would enter into "a field that has no sensible or just stopping point."

*Hornback*, 313 Wis. 2d 294, ¶49 (citations omitted); *see also Coffey v. City of Milwaukee*, 74 Wis. 2d 526, 541, 247 N.W.2d 132 (1976).

¶32 Here, we need look no further than *Wilson v. Continental Insurance Companies*, 87 Wis. 2d 310, 324, 274 N.W.2d 679 (1979), to address this issue. There, our supreme court explained its public policy concerns with claims arising out of dissatisfaction with a school's education. *Id.* at 323-25. Specifically, the court explained that it "will not promote a legal doctrine which would require educational systems to litigate every suit claiming negligence in the selection of curriculum, teaching methods, teachers or extra curricular activities. To rule otherwise would subject schools to constant harassment in the courts." *Id.* at 324.

¶33 The supreme court's concern in *Wilson* falls squarely within public policy factors four and six. The same public policy factors are at issue here. First, allowing recovery "would place too unreasonable a burden" on GRACE and other schools. *See Hornback*, 313 Wis. 2d 294, ¶49 (citations omitted). Schools require flexibility in disciplining students. Forcing GRACE and other schools to weigh the risk of being brought into court every time they discipline a student, or choose not to do so, would be too unreasonable a burden and would "subject schools to constant harassment in the courts." *See Wilson*, 87 Wis. 2d at 324.

¶34 Second, allowing recovery would enter into "a field that has no sensible or just stopping point." *See Hornback*, 313 Wis. 2d 294, ¶49 (citation

15

omitted).  Were we to allow liability here, the door would open to imposing liability on schools for any and all disciplinary action or inaction, and it would force courts to second-guess schools' disciplinary decisions.  *See Johnson v. Northeast Sch. Corp.*, 972 F.3d 905, 912 (7th Cir. 2020) ("[J]udges 'make poor vice principals.'" (citation omitted)).

### III.  Breach of contract claim

¶35     To state a claim for breach of contract, Jauquet's amended complaint was required to allege that: (1) a contract existed between Jauquet and GRACE that created obligations flowing from GRACE to Jauquet; (2) GRACE failed to do what it undertook to do; and (3) GRACE's failure resulted in damages.  *See Brew City Redevelopment Grp., LLC v. The Ferchill Grp.*, 2006 WI App 39, ¶11, 289 Wis. 2d 795, 714 N.W.2d 582, *aff'd sub nom. Brew City Redevelopment Grp., LLC v. Ferchill Grp.*, 2006 WI 128, 297 Wis. 2d 606, 724 N.W.2d 879.  In evaluating a breach of contract claim, the first step is to determine whether a valid contract existed.  *Riegleman v. Krieg*, 2004 WI App 85, ¶20, 271 Wis. 2d 798, 679 N.W.2d 857.  If a contract existed, we next examine whether a party violated its terms and whether such a violation is material enough that it resulted in damages. *Id.*

¶36     A valid contract requires an offer, acceptance, and consideration. *Piaskoski & Assocs. v. Ricciardi*, 2004 WI App 152, ¶7, 275 Wis. 2d 650, 686 N.W.2d 675.  An offer is "the manifestation of willingness to enter into a bargain, made to justify another person's understanding that assent to that bargain is invited and will create a contract."  *Alliance Laundry Sys. LLC v. Stroh Die Casting Co.*, 2008 WI App 180, ¶32, 315 Wis. 2d 143, 763 N.W.2d 167.  It must be "sufficiently certain to enable a court to understand what is asked for, and what

consideration is to mature the promise." ***Id.*** (citation omitted). Consideration is defined as

> "a detriment incurred by the promisee or a benefit received by the promisor at the request of the promisor…. Neither the benefit to the promisor nor the detriment to the promisee need be actual." Additionally, "a promise for a promise, or the exchange of promises, will constitute consideration to support any contract of [a] bilateral nature."

***Runzheimer Int'l, Ltd. v. Friedlen***, 2015 WI 45, ¶21, 362 Wis. 2d 100, 862 N.W.2d 879 (alteration in original; citations omitted).

¶37　The circuit court concluded that GRACE and Jauquet had formed an implied-in-fact contract under which GRACE would act "*in loco parentis*." Jauquet argues that the court was incorrect and that her contract claim is instead based on "GRACE's failures to live up to multiple more specific representations that are clearly pled."

¶38　Jauquet's amended complaint first alleges that GRACE made "representations concerning … enhanced safety protocols, and training … as part of [a] purported commitment to create a 'safe environment for learning' with 'faith-based values that teach mutual respect—resulting in fewer bullying

issues.'"[8]   She further alleges that GRACE's policies included various representations: (1) stating that "Notre Dame is responsive to bullying, harassment, or inappropriate content on student social media"; (2) stating "that victims of bullying will be afforded appropriate victim services and allowed … an opportunity to be heard by administrators"; and (3) "allow[ing] expulsion and even legal action to be initiated" against students.  The amended complaint further alleges that Jauquet "tendered significant consideration and volunteered significant time in reliance on [these representations]."

¶39   Despite these representations, the amended complaint asserts that GRACE failed to offer any victim services to Alex, failed to take legal action as stated in its policies, and failed "to abide by its own policies dealing with bullying, social media, and victim protection," all in violation of its representation about GRACE offering a safe environment.  Jauquet claims that GRACE's failure to abide by its representations and policies breached a contract between Jauquet and GRACE.

¶40   There is little Wisconsin case law on whether a school's informational materials and policies can constitute a contract.  We have previously held, however, that a university bulletin and handbook provided to a student can

---

[8] For her breach of contract claim, Jauquet's amended complaint also pointed to the fact that "GRACE ha[d] repeatedly made affirmative … written representations that it … adher[es] to educational and *spiritual* best practices beyond those found in public schools."  (Emphasis added.)  To the extent that Jauquet alleged a breach of contract claim based on spiritual best practices or lack thereof at GRACE's Notre Dame school, the First Amendment forbids us from considering that claim.  *See, e.g.*, **Houston v. Mile High Adventist Acad.**, 846 F. Supp. 1449, 1454-55 (D. Colo. 1994) ("[W]here resolution … would require the court to determine the truth or falsity of a particular religious belief, consider doctrinal or ecclesiastical questions, such as whether a religious doctrine departs from higher church standards, or settle matters involving internal church procedure, the [F]irst [A]mendment prohibits an adjudication."  (citations omitted)).

create a contractual relationship between a student and a school regarding how the school was to deal with "unethical behavior." *See Cosio v. Medical Coll. of Wis., Inc.*, 139 Wis. 2d 241, 245, 407 N.W.2d 302 (Ct. App. 1987). Conversely, our supreme court has held "that the performance of a legal duty, or the promise to perform a legal duty, is not sufficient consideration to create a contract." *Scott v. Savers Prop. & Cas. Ins. Co.*, 2003 WI 60, ¶¶44-45, 262 Wis. 2d 127, 663 N.W.2d 715 (holding that no contract to provide guidance counseling existed due to a lack of consideration because the school district had a pre-existing legal duty to do what it had allegedly promised to do). That said, we are unaware of any statutory or administrative requirements for private schools related to student discipline or bullying.[9] Nonetheless, assuming without deciding that *Scott* does not prevent a contract from being formed for lack of consideration in this case, we are persuaded by the reasoning of authority from outside our jurisdiction that Jauquet failed to allege a breach of contract claim in this case.

¶41     In *Mulvey v. Carl Sandburg High School*, 2019 IL App (1st) 151615, ¶¶32-33, 66 N.E.3d 507, the Illinois Appellate Court applied facts similar to this case and determined that a school's anti-bullying statements did not constitute a contract. The parents in *Mulvey* sued a school district for, *inter alia*, breach of contract for failure to enforce the school district handbook's anti-bullying policies. *Id.*, ¶¶6-9. The handbook included a policy that stated

---

[9] Of note, WIS. STAT. § 118.46(2) requires "each *school board* [to] adopt a policy prohibiting bullying by pupils." (Emphasis added.) A school board is defined as "the school board or board of school directors in charge of the schools of a school district." WIS. STAT. § 115.001(7). We need not determine if GRACE fits the definition of a "school board," as we decide this issue on narrower grounds. *See Patrick Fur Farm, Inc. v. United Vaccines, Inc.*, 2005 WI App 190, ¶8 n.1, 286 Wis. 2d 774, 703 N.W.2d 707 ("[W]e decide cases on the narrowest possible grounds.").

preventing bullying was an "important" school district "goal." *Id.*, ¶6. The policy required the school district to develop a program to implement the policy, which included: "conducting prompt and thorough investigations of alleged incidents of bullying, intimidation, or harassing behavior; providing students who violate the policies with appropriate consequences and remedial action; and protecting students against retaliation for reporting such conduct." *Id.* Additionally, the policy listed potential disciplinary actions, including suspension and law enforcement involvement. *Id.*, ¶7. The plaintiffs contended that the handbook created an offer that they accepted by enrolling their children at the school. *Id.*, ¶31.

¶42 The Illinois Appellate Court concluded that under these circumstances, there was no offer for purposes of forming a contract because the handbook's contents were "merely hortatory and convey[ed] no specific promises." *Id.*, ¶32. There was no specific promise in the handbook to eliminate bullying—instead the handbook policy stated that the school board's "goal" was to prevent bullying. *Id.* The court further concluded that "[t]he creation, implementation, and enforcement of a policy prohibiting bullying, as required by [s]tate law, simply does not promise students and parents that attendance at the school guarantees the complete absence of bullying conduct, nor that every student engaging in such conduct will be disciplined in a particular manner." *Id.*

¶43 Like the complaint in *Mulvey*, Jauquet's amended complaint does not allege that GRACE made any specific promises about eliminating bullying upon a student's enrollment in one of GRACE's schools. Instead, the amended complaint points to statements describing GRACE's values. *See* WIS JI—CIVIL 3012 (1993) ("A mere expression of intention, opinion, or prophecy is not an offer."). For example, GRACE's policy stating that it is "responsive to bullying,

harassment, or inappropriate content on student social media" does not equate to an offer that results in a contract upon a student's enrollment. Similarly, GRACE's policy stating that it has "enhanced safety protocols[] and training" to create a "safe environment" are merely written values. Furthermore, like the "merely hortatory" policies in *Mulvey*, GRACE's policies do not explain how its values related to bullying or a safe environment will be implemented. For example, GRACE's policy "that victims of bullying will be afforded appropriate victim services and allowed … an opportunity to be heard by administrators," is not sufficiently specific to permit a court to determine what is being offered for purposes of forming a contract.

¶44 In all, none of the statements alleged in the amended complaint amount to an offer because none of them are "sufficiently certain to enable a court to understand what is asked for, and what consideration is to mature the promise."[10] *See Alliance Laundry Sys.*, 315 Wis. 2d 143, ¶32 (citation omitted); *cf. Ferraro v. Koelsch*, 124 Wis. 2d 154, 165, 368 N.W.2d 666 (1985) (handbook created a contract that converted at-will employment to one bound by terms in handbook when it "set up a hierarchy of rules … with the promise that an employee would be *entitled* to different treatment depending upon the type of alleged misconduct and, most importantly, that a discharge would only be for 'just cause'"). In other words, GRACE's policies and representations do "not promise students and parents that attendance at the school guarantees the complete absence

---

[10] We also note that Jauquet's amended complaint fails to demonstrate that GRACE breached any of its policies. For example, GRACE did meet with Jauquet and Alex regarding the bullying. Further, Notre Dame suspended Thomas as a result of his troubling behavior, although nothing in GRACE's policies required Notre Dame to suspend him.

21

of bullying conduct, nor that every student engaging in such conduct will be disciplined in a particular manner." *See **Mulvey***, 66 N.E.3d 507, ¶32.

## CONCLUSION

¶45     We conclude that, even if Jauquet's claims were not for educational malpractice, the circuit court properly dismissed her claims because she failed to allege sufficient facts to support each element of her claims and because her negligence claims are barred by public policy.

> *By the Court.*—Order affirmed.

> This opinion will not be published.     *See* WIS. STAT. RULE 809.23(1)(b)5.